El Pueblo de Puerto Rico, demandante y apelado, *v.* Felícito Santiago, acusado y apelante.

Núm. 7971.—*Sometido:* Febrero 6, 1940. *Resuelto:* Febrero 13, 1940.

*Agustín E. Font,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO emitió la opinión del tribunal.

La acusación, base de esta causa, imputa a Felícito Santiago, el apelante, un delito de asesinato en primer grado, cometido como sigue:

"...Felícito Santiago, con anterioridad a la presentación de esta acusación o sea allá en o por el día 1º. de diciembre de 1936, y en la Municipalidad de Yauco, que forma parte del Distrito Judicial de Ponce, P. R., y en ocasión en que atacó, con la intención de cometer

el delito de violación, en la niña menor de catorce años de edad, Hortensia García, conocida por Hortensia Lugo, quien allí y entonces no era esposa del acusado, voluntaria y criminalmente dió muerte ilegal a la citada niña Hortensia García conocida por Hortensia Lugo.''

Celebrado el juicio que duró dos días, el jurado rindió su veredicto declarando culpable al acusado, dictando la corte su sentencia condenándolo a reclusión perpetua.

Apeló el condenado y en su alegato señala siete errores cometidos a su juicio por la corte al denegar una instrucción al jurado solicitada cuando el fiscal comenzó a exponerle su caso, al permitir que declararan los testigos Arturo Castro y Vicente Piazza sin que sus nombres aparecieran al dorso de la acusación, al permitir que el testigo Castro describiera el sitio de los sucesos, al desestimar cierta moción pidiendo la disolución del jurado, al negar cierta pregunta que se le hiciera cuando declaraba como testigo y al negar tres instrucciones sometídasle por escrito.

▇ Los hechos en relación con el primer señalamiento ocurrieron así:

Constituído el jurado, concedió el juez la palabra al fiscal, como sigue:

"El fiscal, para exponer la teoría de su caso a los señores del jurado..."

El fiscal comenzó:

"Señores del jurado: van ustedes a intervenir en el día de hoy en uno de los casos más graves que hace tiempo no se cometían en la Isla de Puerto Rico.''

La defensa dijo:

"Señor juez, voy a pedirle a la corte que dé una instrucción al jurado explicándole que las manifestaciones del fiscal deben limitarse a exponer los hechos en que va a basar su teoría, no a conclusiones a las cuales ustedes deben llegar de acuerdo con los hechos, después que consideren toda la prueba y reciban las instrucciones de la corte.''

Y el juez resolvió:

"Eso se hará en las instrucciones finales, pero el fiscal no ha hecho nada más que empezar a hablar."

La defensa tomó excepción.

Nada contrario a la ley o a la jurisprudencia, o que perjudique indebidamente al acusado, podemos encontrar en las manifestaciones del fiscal. Se refirió al crimen en sí mismo, grave en verdad, no al acusado. Refiriéndose no ya al informe de un fiscal si que a las instrucciones de un juez, esta corte por medio de su entonces Juez Asociado Sr. Hernández, en el caso de *El Pueblo* v. *Boria*, 12 D.P.R. 170, 176, se expresó así:

"Las instrucciones dadas por el juez al jurado no pueden calificarse de parciales.

"Ellas comenzaron así:

" 'Señores del jurado: Ya el debate entre las partes ha terminado y el horrendo crimen que se investiga va a quedar sometido a vuestra consideración y resolución, como árbitros únicos para decir la última palabra.'

"El horrendo crimen a que el juez se refiere es el descrito en la acusación, y las frases transcritas no contienen apreciación alguna sobre la existencia del mismo, según y como se relató por el fiscal. Esa apreciación quedó sometida a la consideración y resolución de los jurados, que el juez reconoce eran los llamados a decir su última palabra. El crimen en verdad era horrendo, y al reconocerlo así el juez, no hizo más que publicar una verdad que se desprendía de los mismos términos de la acusación, sin que por ella pueda decirse que influyera en el ánimo del jurado para que declarara al reo culpable del delito imputádole.

"Bien podemos aplicar al presente caso lo que ya dijo esta corte por medio del juez Sr. Figueras, al resolver el recurso de apelación interpuesto por Felipe Robles en causa por asesinato en primer grado, cuyo recurso fué decidido en 25 de abril del año próximo pasado:

" 'El proceso en verdad que era grave toda vez que se juzgaba un hecho que dió por resultado privar de la vida a un hombre, y si el juez, dirigiéndose al jurado, reconoció esa gravedad no hizo más que publicar una verdad que seguramente estaba encarnada ya en la conciencia de los que habían de juzgar. Una cosa es reconocer la

gravedad del proceso considerado en sí mismo por su propia naturaleza y con abstracción completa del autor del hecho criminal, y otra hubiera sido relacionar esa gravedad con el acusado, cosa que no resulta de esas instrucciones.' ''

El primer error no fué, pues, cometido. Tampoco se cometieron el segundo y el cuarto, que se refieren a haber permitido la corte que declararan dos testigos cuyos nombres no figuraban al dorso de la acusación.

Desde 1906 dijo esta corte por medio de su Juez Asociado Sr. MacLeary en el caso de *El Pueblo* v. *Kent,* 10 D.P.R. 343, 388:

"En las excepciones Núms. 24, 30, 31 y 32, el acusado se opuso al testimonio de los testigos Peterson, Candina, Morris y Tuzo, por el motivo de que sus nombres no habían sido presentados al acusado con arreglo a la ley.

"Es de presumirse que estas excepciones estén basadas en el artículo 142 del Código de Enjuiciamiento Criminal, que dice lo siguiente:

" 'Artículo 142. El fiscal deberá formular la acusación, la cual consiste en la lectura de la misma, y entrega de una copia de ella, al acusado, con las correspondientes notas al dorso, inclusa la lista de testigos, después de lo cual el tribunal pregunta al acusado, si se confiesa culpable o niega la acusación.'

"El objeto de esta ley no fué impedir que el fiscal examinase algún testigo, cuyo nombre no estuviese anotado al dorso de la acusación. Una ley parecida a la nuestra, existe en California, y fué interpretada por el Tribunal Supremo de aquel Estado, en los siguientes términos:

" 'No era error de parte del tribunal, el permitir que se tomase juramento a un testigo de cargo, porque su nombre no estaba anotado en la acusación. Sucede frecuentemente que en el acto de la vista, surge la necesidad de presentar determinados testigos; y la justicia sería grandemente obstaculizada si se confirmase la regla invocada, sin que de ella resultaran ventajas correspondientes.' (*The People* v. *Bonney,* 19 Cal. 447.)

"En el mismo sentido son las decisiones de dicho eminente tribunal, en las causas siguientes: *People* v. *Jocolyn,* 29 Cal. 562; *People* v. *López,* 26 Cal. 112; *People* v. *Symonds,* 22 Cal. 348; *People* v. *Fireland,* 6 Cal. 96.

"La presentación y examen de testigos en el acto del juicio de una causa criminal, se hallan necesariamente sometidos a la discreción del tribunal sentenciador, y en muchos casos, el juez debe ejercer una sana discreción judicial, al dirigir los mismos. A no ser que dicho juez haya ejercido su discreción de tal manera que resulten perjudicados los derechos del acusado o los del Pueblo, sus resoluciones en tales materias, no están sujetas a revisión. (Ley de mayo 30 de 1904; sesión extraordinaria, pág. 10.)"

Y examinadas las circunstancias concurrentes en este caso no resulta en modo alguno que la corte abusara de su poder discrecional. Cuando se llamó a declarar a los testigos de que se trata el acusado por su abogado se limitó a oponerse por el hecho de no aparecer sus nombres al dorso de la acusación. No alegó sorpresa, ni perjuicio, ni necesidad de tiempo para refutar en su caso sus declaraciones.

El tercer error se señala, pero no se argumenta. Es claro que habiendo estado el testigo Castro en el sitio en que el crimen fué cometido, pudo describirlo. No hubo error.

El quinto señalamiento se refiere a la negativa de la corte a disolver el jurado. Se formula así:

"Por haber desestimado la Corte una moción solicitando que el jurado fuera disuelto fundándose la defensa en que algunos de sus miembros, por sus actuaciones, habían formado ya juicio en contra del acusado cuando aún la prueba de defensa no se había terminado de ofrecer y el jurado no había recibido el caso para su decisión final, violándose, además, la presunción de inocencia que acompaña al acusado aún en el acto mismo de estar deliberando el jurado, (Páginas 195, 196, 197 y 198 de la T. de la E.)"

Examinadas las páginas señaladas de la transcripción encuéntrase la discusión del incidente en todos sus detalles y puede verse que el motivo que tuvo la defensa fué que uno de los jurados pidió que se llamara a declarar a una testigo a fin de preguntarle sobre el color del traje de la niña muerta, después de haber declarado un testigo de la defensa sobre el particular. La resolución de la corte habla por sí misma y se sostiene. Fué:

"La corte declara sin lugar la moción de la Defensa por entender que el jurado señor Toro, miembro de este jurado que entiende en este caso, tiene el derecho a hacer preguntas a cualesquiera testigos y, además, porque la propia Defensa no hizo objeción a que se llamara a esa testigo determinada que indica la Defensa para hacerle la pregunta que le hizo—desde luego, sin saber qué pregunta era. El hecho de que se haya referido a una parte que considera la Defensa como esencial—la corte también cree que es así, lo considera así—no priva al jurado de ese derecho. Y es muy importante la pregunta de cómo estaba vestida la niña aquel día, precisamente, para poder tener una opinión justa y razonable, de acuerdo con la prueba."

▋ Discutiendo el sexto señalamiento, dice el apelante en su alegato:

"Fúndase este error en que la Corte negó que se le preguntara al acusado sobre otras muertes misteriosas ocurridas en la casa donde vivía la niña interfecta.

"La teoría de la defensa tendía a demostrar, no sólo que el acusado no había cometido los hechos que se le imputan, sino que en la muerte de dicha niña pudo haber intervenido otra persona. En ese sentido tratamos de probar que en aquella casa, donde la niña vivía recogida, habían ocurrido anteriormente las muertes de otras niñas. Y que, existían tales circunstancias que podían hacer suponer, que, por motivos especiales, la niña había sido víctima de las iras de una persona distinta del acusado.

"Cuando interrogábamos al testigo Felícito Santiago (Páginas 223 y 222 de la T. de la E.) la Corte negó el derecho a que se declarara sobre ese extremo."

Consta de la transcripción que llamado a declarar como testigo el acusado, en el curso del interrogatorio de su abogado defensor ocurrió lo que sigue:

"¿Ahí en esa casa de Francisco Torres habían muerto otras niñas?—Sí, había habido dos muertes más.—Fiscal: Me opongo a eso, señor Juez. El compañero está queriendo demostrar que ha habido crímenes en la casa de Francisco Torres.—Defensor: Yo no hablo de crímenes; yo voy a sostener que ha habido dos muertes más en la casa de Francisco Torres.—Fiscal: Vamos a suponer que haya habido cuarenta ¿qué materialidad tiene eso con esto, señor juez?—Juez: Con lugar la objeción. No veo qué tenga que ver que

hayan muerto allí otras personas. En toda casa han muerto otras personas.—Defensor: Pero es para demostrar que ha habido dos muertes más, repentinas, casi misteriosas.—Fiscal: ¿Pero quién ha cometido esos crímenes, si han sido crímenes?—Defensor: Tampoco se sabe todavía si éste es crimen.—Fiscal: Sí, cómo no. Yo lo sé.— Defensor: Lo sabrá el fiscal; yo todavía no lo sé.—Juez: Con lugar. No estamos investigando ningún otro hecho nada más que el del caso que se ventila.—Defensor: Tomamos excepción porque ha habido prueba con relación a eso de otras muertes de otras muchachitas allí, y era nuestro intento que el jurado apreciara ese hecho y resolviera lo que en justicia fuera su criterio.''

No hubo error. No surge la conexión que pudieran tener esas otras muertes con la de Hortensia García.

■ Tampoco fué cometido el séptimo y último de los errores señalados porque las instrucciones que la defensa pidió a la corte que trasmitiera al jurado y la corte no trasmitió o eran claramente improcedentes o habían sido ya dadas en forma amplia y correcta por la corte al jurado.

Este es un caso en el que se observa que la defensa cumpliendo hasta el límite su misión hizo cuanto le fué dable hacer en pro de su defendido, pero en el que la prueba de la culpabilidad de éste es tan fuerte que ni siquiera se hace a ella referencia en el alegato.

Las instrucciones de la corte al jurado contienen un amplio y detallado resumen de la prueba de cargo y de descargo, pareciéndonos oportuno transcribir para formar un concepto más acabado del caso, por lo menos una parte del que se refiere a la de cargo creída por el jurado. Es así:

''....el fiscal...ha presentado prueba testifical, pericial, documental y material, consistente esta última en esa yagua que fué traída aquí, encontrada por el fiscal cuando estuvo en el sitio donde se dice ocurrieron los hechos; además de la ropa que usaba el acusado el día primero de diciembre, o sea una camisa·y un pantalón, aparte del botón que está dentro de este sobre, que irá a manos de ustedes, encontrado también en el sitio de los sucesos, y que corresponde, según declaración de algunos testigos, a una de las mangas de esa camisa, que usaba el acuscado el día de los sucesos....

"La prueba testifical...tiende a demostrar...que este acusado, el día 2 de diciembre de 1936 y que cuando se llevaba a efecto el entierro de la niña Hortensia Lugo, que había fallecido el día antes por la tarde, se presentó en casa de Miguel Angel Vera a pedir agua, que él estaba pálido o medio borracho, de acuerdo con varios testigos. En cuanto a este extremo del caso han declarado Miguel Angel Vera, Luz María Vera, Justino Vargas—que declaró que era primo del acusado—Elena Pérez, Lucila Rodríguez y Santos Rodríguez: seis testigos. Estando todas esas mujeres en esa casa cosiendo, y encontrándose allí Justino Vargas y Miguel Angel Vera, al llegar y pedir agua el acusado, él mismo manifestó que él iría para la cárcel por el caso de la niña que mataron; que no habían arrestado a nadie, pero que él iría a la cárcel por ese caso, pero que podría quizás salir bien porque él le había dicho a una señora que tuviera cuidado con lo que dijera y no metiera la pata. Con motivo de esta declaración, que en confidencia llegó a la Policía, que estaba investigando la muerte de esta niña, aparecida en el barrio Quebradas, de Yauco, fué arrestado el acusado.

"Os declaró la testigo Gumersinda Pacheco que vivía con Francisco Torres, o sea en la casa donde vivía la niña Hortensia Lugo; que el día primero de diciembre esa niña salió a buscar yerba para unos animales, para unas cerdas; que el acusado andaba por allí; que como a las tres de la tarde ella fué a buscar a la niña y vió salir al acusado de unas matas, de una mancha de café o algo por el estilo, y que éste le dijo que cuidado con lo que fuera a declarar y no metiera la pata porque vería lo que le podría pasar; que el acusado estaba como borracho; que ella entonces vió, por entre las matas, allá adentro, a la niña en el suelo, que estaba muerta; que entonces la testigo se fué para su casa y no se atrevió ir donde ella hasta que llegó Francisco Torres, que le enseñó el sitio, y éste fué a buscar al comisario del barrio; que con anterioridad a ese día el acusado le había dicho a la niña esa que tenía que ser suya; que la niña era soltera y que no estaba casada con el acusado; que tendría de diez a doce años. A pregunta de uno de los señores del jurado, cuando fué llamada de nuevo a declarar, dijo que la niña estaba vestida de color caqui, con un zagalejo.

"El Alcaide de la Cárcel Municipal de Yauco, Juan Rueda, os declaró que cuando el acusado fué llevado a la cárcel, cuando le llevaron ropa allí, se cambió la que tenía puesta, que es ésta que ha sido identificada en el día de ayer.

"Gumersinda Pacheco volvió a declarar y reconoció esa ropa como la misma que el acusado usaba ese día, el día primero.

.

"La próxima prueba presentada por el fiscal fué la declaración del acusado, prestada ante él, que ha sido ya leída a ustedes y no creo necesario hacerlo de nuevo en el curso de estas instrucciones, ya que dicha declaración irá en su totalidad a ustedes. En esa declaración el acusado admite que atacó a esa niña con la intención de realizar actos carnales con ella, pero que lo hizo a invitación de ella.

"Os declaró el señor Arturo Castro, redactor y representante del periódico EL MUNDO, aquí, en Ponce, que acompañó al fiscal cuando éste fué a investigar, al sitio de los sucesos; os describió el sitio aquél y os manifestó que estando allí, el acusado, que fué llevado también, aceptó que había sido en una yagua debajo de la palma, que había tratado de realizar esos actos con la niña; que ella lo había invitado; que él al principio no quiso, pero que ella insistió y entonces él trató de hacerlo, pero que no terminó porque se dió cuenta de que estaba cometiendo un delito. Explicó el testigo que por allí había piedras, que estaba la yagua esa, y que el acusado dijo que había dejado a la niña acostada allí. A repreguntas dijo el señor Castro, que el acusado no admitió que él hubiera matado a la niña, que no había manchas de sangre en la yagua.

"Vicente Piazza, el guardia de penales, os declaró que el propio acusado le pidió un día que lo subiera a la Fiscalía, donde el fiscal, pues él quería declararse culpable siempre y cuando se le consiguiera que el juez le impusiera treinta años de presidio; que él lo trajo aquí arriba adonde el fiscal; que el fiscal le dijo que él no podía hacer esa transacción con él.

"Os declararon después el sargento de la policía insular, Jesús Vargas Rosado, y Juan Rueda, en relación con el hecho de haber sido llevado el acusado al sitio de los hechos, y cómo se encontró el botón éste y que el acusado admitió que era de su camisa, pero que le había cambiado el botón de la manga una tía o algún familiar de él; que asimismo admitió el sitio donde se había encontrado con Gumersinda.

"El doctor Julio Roca declaró los golpes que presentaba esta niña cuando él le practicó la autopsia; tenía erosiones en los brazos y magulladuras, y en la cara, sangre por el oído derecho y también en el ojo derecho; que la niña era de diez a doce años de edad; que tenía una hemorragia en el lado izquierdo de la cabeza y una fractura en la base del cráneo, hacia el lado derecho; que murió a consecuencia de una hemorragia interna y fractura del cráneo; y que, además, presentaba magulladuras o erosiones sobre la vulva o labios de sus partes genitales, pero que no hubo violación; es decir,

que la niña no fué violada. Os declaró el doctor, además, que él habló con el acusado en su oficina después de la autopsia, y que éste le dijo que era la niña quien lo llamaba para realizar actos carnales con él varias veces, y que ese día también, pero que él no le había hecho nada.''

*Debe el recurso declararse sin lugar y confirmarse la sentencia apelada.*