EL PUEBLO DE PUERTO RICO, apelado, *v.* JESÚS RAMOS ÁLVAREZ, acusado y apelante.

*Número:* CR-83-76    *Resuelto:* 7 de mayo de 1987

*Harry N. Padilla Martínez,* abogado del apelante; *Américo Serra, Procurador General Interino, Josefa A. Román García, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del Tribunal.

Debemos resolver si bajo el cuadro fáctico de este caso y a tenor con la doctrina de *Pueblo* v. *Rivera Tirado,* 117 D.P.R. 419 (1986), el haber pospuesto por veintiséis días un juicio ya

comenzado constituye un error que da lugar a la revocación de las sentencias y la celebración de un nuevo juicio. Dicha suspensión y señalamiento se hizo a pesar de la oportuna objeción de la defensa.

El Ministerio Fiscal acusó a Jesús Ramos Álvarez de violar los Arts. 6 y 8 de la Ley de Armas, 25 L.P.R.A. secs. 416, 418 y de asesinato en primer grado, 33 L.P.R.A. sec. 4002. Celebrado el juicio ante jurado, éste rindió veredictos de culpabilidad por asesinato en segundo grado, con votación de 9 a 3 y en el caso del Art. 8 por unanimidad. El juez emitió fallo de culpabilidad por la infracción al Art. 6. Oportunamente fue sentenciado a cumplir dieciocho años de reclusión por el delito de asesinato en segundo grado y a una pena de tres años de presidio por el Art. 8 y seis meses por el Art. 6, cuyos términos se cumplirían consecutivamente.

Los hechos(¹) que dan lugar al fallo de culpabilidad ocurrieron el 31 de diciembre de 1982 frente al Bar La Esperanza de Añasco. El único testigo ocular que atestó en el juicio, Roberto Matías Perea, declaró que David Talavera llegó al Bar La Esperanza, unos veinticinco minutos antes de su muerte, en aparente estado de embriaguez.(²) En dicho lugar, Talavera pidió varios tragos al dueño del local, conocido por Papo, quien era hermano del apelante, y mientras éste le servía, Talavera le tocaba la cara y decía que él no era un rata. Surge además que a solicitud de los parroquianos que se encontraban en el local, Talavera se marchó en dirección a su auto. Una vez en él, inició la marcha para alejarse del sector pero retrocedió para acercarse al bar nuevamente. En esos momentos alguien da la voz de que Talavera sacó un arma y luego se oyeron unas detonaciones.

---

(¹) Resumimos los hechos básicos según surgen de la exposición narrativa de la prueba preparada por la defensa y aprobada por el tribunal, sin objeción del fiscal.

(²) Hecho corroborado por el protocolo de autopsia.

El testigo Matías Perea declaró en el directo que no había "visto" las detonaciones. Pero, según surge de la exposición narrativa de la prueba, págs. 4–6, también testificó lo siguiente:

. . . que el occiso arrancó el automóvil en dirección a Añasco, pero que de repente se det[uvo] y di[o] marcha atrás; que cuando el occiso di[o] marcha atrás él estaba dentro del negocio frente a la vellonera la cual no estaba encendida; que el occiso detuvo el carro como a doce pies del testigo; que de donde él estaba él podía ver la parte de atrás del carro; que cuando el occiso di[o] marcha atrás alguien gritó que éste había sacado un arma; que cuando eso sucedía el acusado y Perfecto estaban dentro de la tienda; que al él o[í]r eso se movió y se arrinconó a la vellonera; que al hacer ese movimiento él no se fijó d[ó]nde estaba el acusado; que en el momento del grito en el negocio había como quince o dieciséis personas; que éstos estaban en silencio; que la persona que gritó lo que dijo fue "cuidado que sacó un arma"; que oyó bien claro lo de "cuidado sacó un arma"; que en ese momento él vi[o] al acusado acercarse al carro por la puerta del conductor; que el acusado se tardó cuatro o cinco segundos en llegar al carro del occiso; que no recuerda cu[á]ndo el acusado se despegó del mostrador; que una vez el acusado salió fuera del negocio se acercó al carro del occiso y forcejearon; que el forcejeo lo hicieron estando uno dentro del carro y el otro frente a la puerta; que lo que él alcanzó a ver fue al acusado y al occiso empujándose; que lo que él vi[o] [fue] dos o tres empujones; que cuando él vi[o] el forcejo se retiró y se escondió en la tienda; que durante el forcejeo no oyó que mediaran palabras; que luego de esconderse no vi[o] m[á]s nada; que mientras él vi[o] lo que pasaba no recuerda si el occiso salió del carro; que lo que él vi[o] lo hizo por espacio de cuatro o cinco segundos aproximadamente; que estando escondido en la tienda oyó varias detonaciones, no sabe qu[é] las produjo; que luego de la última detonación esperó un ratito, salió fuera del negocio, se montó en su carro y se dirigió a su casa; que al salir del negocio no se fijó en lo que había en el carro del occiso; que ya todo el mundo se había ido para su casa; que el carro del occiso se encontraba como a ocho pies de donde él estaba; que bajo el estado de

nervios que él salió no miró al carro del occiso y se fue derecho para su casa; que había hablado con el Fiscal César Mercado el día de la investigación del caso en Añasco. El testigo fue confrontado con una declaración jurada prestada por él el día 1ro. de enero de 1983 ante el Fiscal César Mercado ([*exhibit*] VII del pueblo) y admitió haberla efectuado de su puño y letra. Declaró, que dicha declaración la había hecho el 1ro. de enero a las 4:00 de la tarde en el cuártel de la policía de Añasco; que el agente Armando González y el Fiscal César Mercado lo habían presionado para que diera dicha declaración; que la presión que el Fiscal Mercado le hizo fue que le dijo "si no decía la verdad lo iba a enviar para la cárcel de Aguadilla"; que lo que [é]l puso en la declaración "González le dijo que lo pusiera"; "que él dijo esa noche la verdad"; confrontado con la declaración jurada en la cual en una parte había dicho "David salió fuera del negocio aconsejado por m[í] se montó en el carro y Dio [*sic*] asia [*sic*] atrás y viro [*sic*] el carro frente al negocio y en [ese] momento fue que jesus [*sic*] se le acerco [*sic*] al carro y le quito [*sic*] Revolvel [*sic*] a David y jesus [*sic*] dio unos pasos asia [*sic*] atras [*sic*] y le Disparo [*sic*] A [*sic*] David varias veces y se retiro [*sic*] varios piez [*sic*] . . ." con lo declarado en el interrogatorio directo en el sentido de "que no había visto las detonaciones"; se le preguntó que cu[á]l de las dos versiones era lo cierto, a lo que respondió "lo cierto es que no vi los disparos, s[í] los sentí"; a preguntas del tribunal el testigo declaró que lo que había escrito en el papel era la verdad, que lo que decía la declaración es la verdad; que lo cierto es que Papo le dijo al occiso, al éste pedir el primer trago, que se fuera del negocio; que a pesar de que antes había declarado que no había hablado al occiso lo cierto es que él le dijo también que se fuera; se le confrontó con el hecho de si se mantuvo en el negocio después del último disparo o si se fue para su casa rápidamente, a lo que manifestó que él esperó hasta que creyó que no habría más tiros y tan pronto eso sucedió se marchó a su casa. Se le preguntó por el tribunal que cuál de las dos versiones era la cierta, si la ofrecida en sala o la escrita, a lo cual el testigo declaró que la escrita; que "después de los disparos todo el mundo se alejó y dejaron a David solo en el carro y yo me fu[i] para mi casa"; que no recuerda muchas de las cosas que declaró ante

el Fiscal al otro día de los hechos, por la presión que le hizo el agente Armando González y el Fiscal; que la presión era que si no ponía lo que ellos le decían lo mandarían para Aguadilla; que la presión era que le decían que si no decía la verdad lo mandaban para Aguadilla; que no lo presionaron de ninguna otra manera, que no lo amenazó ni se le acercó. Finalmente el Fiscal César Mercado le preguntó si él consideraba que él como Fiscal había sido irrespetuoso en algún momento durante la investigación, a lo que el testigo respondió en la afirmativa y explicó que ello se debía a que él le metió miedo de que lo mandaría para la cárcel.

Luego en el contrainterrogatorio declaró que cuando Talavera dio hacia atrás fue que gritaron que había sacado un arma; que en ese momento fue que el acusado y Talavera empezaron a forcejear en el carro; que en eso él se escondió. (E.N.P., pág. 8.)

Nos remitimos nuevamente a la exposición narrativa por ser un reflejo fiel de lo acontecido. De la misma surge que en ese momento aconteció lo siguiente:

Terminado de prestar testimonio Roberto Matías Perea, el Fiscal César Mercado llamó como segundo testigo al policía José A. López. En ese momento la defensa objetó la presentación de dicho testigo debido a que el mismo no aparecía anunciado en el pliego acusatorio como testigo de cargo. El tribunal sostuvo a la defensa en su planteamiento. Luego de eso el mencionado fiscal informó al tribunal que dicho testimonio, al igual que el del agente Armando González, quien tampoco había sido anunciado como testigo, eran indispensables para su caso, por lo que solicitaba que se incluyera los mismos, se suspendiera el proceso y se le diera a la defensa un término para prepararse. La defensa por su parte se opuso a la suspensión; alegando que el Ministerio Público el día anterior había declarado que estaba listo para entrar al juicio y que ahora no podía alegar lo contrario. No empece a esos argumentos el tribunal concedió lo solicitado por el Fiscal. Luego de eso el tribunal llamó al panel de jurado y le informó que el proceso por una cuestión de derecho tenía que suspenderse y que el mismo continuaría el próximo 8 de agosto.

Ante ese señalamiento la defensa planteó que el mismo era uno muy largo, lo que podía ocasionar que el jurado se contaminara, no empece a ello el tribunal lo mantuvo. E.N.P., págs. 9–10.

Al reanudarse el proceso veintiseis días después, el tribunal sustituyó al jurado Sr. Amador Acosta con motivo de una situación que discutiremos más adelante.

Al reanudarse el juicio el policía López declaró que acudió a la casa del dueño del negocio a investigar, y el aquí apelante salió con las manos en alto indicando que tenía el arma en la cintura. La investigación sobre el arma ocupada reveló que ésta pertenecía a Talavera, quien únicamente poseía licencia de tiro al blanco.

El apelante señala que en el proceso celebrado en su contra:

1. Cometió error el Honorable Tribunal de Instancia al suspender el proceso, sobre la objeción de la defensa, luego de haber comenzado el desfile de la prueba de cargos, para que el Ministerio Público incluyera otro testigo, el cual tuvo la oportunidad de incluirlo con anterioridad, pero que sin razón alguna no lo había hecho.

2. Cometió error el Honorable Tribunal de Instancia al suspender el proceso sobre la objeción de la defensa, para veintis[é]is días después de haber comenzado el desfile de la prueba de cargo y luego de que la defensa le señalara que una suspensión tan extensa podía dar lugar a que el jurado fuera indebidamente influenciado en contra del acusado apelante.

3. Cometió error el Honorable Tribunal de Instancia al no disolver el jurado que intervino en el proceso luego de percatarse personalmente y demostrársele que uno de los miembros del cuerpo llevó información al cuerpo en pleno en cuanto a unos acercamientos que le habían hecho en contra del acusado, amigos y familiares de la víctima, durante el período de tiempo que el proceso estuvo suspendido.

El apelante argumenta su primer señalamiento a base de que el tribunal abusó de su discreción, al suspender el juicio, ya que carecía de fundamentos para ello. El Procurador General sostiene que el tribunal actuó conforme a derecho.

La Regla 52 de Procedimiento Criminal establece que:

En los casos en que se presentare acusación, antes de someterse a juicio al acusado deberá llevársele al tribunal para el acto en sesión pública de la lectura de la misma, a no ser que en ese acto el acusado renunciare a dicha lectura, y para que formule su alegación. Sujeto a lo dispuesto en la Regla 243, el acusado deberá hallarse presente para la lectura de la acusación. Se le entregará una copia de la acusación con una lista de los testigos, antes de que se le requiera que formule alegación alguna. 34 L.P.R.A. Ap. II, R. 52.

La Regla 64(ñ) de Procedimiento Criminal establece que podrá solicitarse la desestimación de la acusación o de la denuncia si "no se ha notificado al acusado la lista de los nombres y direcciones de los testigos que El Pueblo se propone usar en el juicio". 34 L.P.R.A. Ap. II, R. 64(ñ). La razón por la cual se requiere que al acusado se le suministre la lista de los testigos de cargo es para que éste pueda prepararse adecuadamente para el juicio. *Hoyos Gómez* v. *Tribunal Superior*, 90 D.P.R. 201, 203 (1964).

En *Pueblo* v. *Santiago*, 56 D.P.R. 109 (1940), el apelante planteó como error que el tribunal permitiera la inclusión de dos testigos no anunciados, sin suspender el proceso para permitir dicha inclusión y darle oportunidad a la defensa de prepararse. Resolvimos bajo el Art. 142 del Código de Enjuiciamiento Criminal del cual procede la Regla 52 actual, y de acuerdo con las circunstancias allí presentes, que el tribunal no abusó de su discreción al permitir que dos testigos no anunciados declararan en el juicio. Consideramos entonces que el allí apelante no alegó sorpresa, ni perjuicio, ni necesidad de tiempo para refutar sus declaraciones. Reafirmamos que el tribunal, dentro de su discreción, puede permitir la inclusión de testigos no anunciados en el juicio.

En el caso ante nos la suspensión la concedió el magistrado para darle oportunidad a la defensa de prepararse adecuadamente. Sin embargo, surge claramente del expediente de autos

que el fiscal fue quien solicitó la suspensión argumentando que ello era necesario para la defensa. Ésta se opuso a la misma. Los testigos a incluirse fueron los agentes investigadores González y López, asignados a raíz de los hechos que dan lugar a las acusaciones contra el aquí apelante, los cuales habían participado en la vista preliminar. (3) Al no alegar la defensa sorpresa, perjuicio, ni necesidad de tiempo para prepararse, el juez debió haber permitido los testimonios. En las circunstancias presentes erró al suspender el juicio.

En cuanto al segundo señalamiento de error, argumenta el apelante que el señalamiento de la continuación del juicio para veintiséis días después le violó su derecho a juicio rápido, a un juicio justo e imparcial, a que la duración de la suspensión y señalamiento del juicio para veintiséis días después podía dar lugar a que el jurado fuera indebidamente influenciado.

Apoya su argumentación de violación a derecho a juicio rápido en la decisión de *Barker* v. *Wingo*, 407 U.S. 514 (1972). En *Pueblo* v. *Rivera Tirado*, supra, examinamos el aspecto referente a la dilación en el desenvolvimiento del juicio. Allí recogimos y aplicamos de *Barker* v. *Wingo*, supra, los cuatro criterios a examinarse en conjunto y las circunstancias relevantes para evaluar las reclamaciones de violaciones al derecho a juicio rápido: (1) duración de la tardanza; (2) razones para la dilación; (3) si el acusado ha invocado oportunamente ese derecho; (4) perjuicio resultante de la tardanza. Señalamos además que ninguno de los factores es determinante y están sujetos a un balance. Resolvimos que los criterios apuntados por su equivalencia conceptual son extensivos al juicio en su fondo.

Señalamos, además, que el derecho a juicio rápido conlleva el análisis de diversos factores. La pesquisa de si se in-

---

(3) De los autos originales se desprende que las denuncias originales fueron presentadas por el agente Armando González, en las cuales figuraba como testigo el policía López.

fringió o no ese derecho, no debe descansar exclusivamente en una regla inflexible adherida a medidas de calendario que impida la ponderación de todos los intereses en juego. El enfoque es más bien de tipo pragmático y responde a la naturaleza inherente de la dinámica del derecho a juicio rápido. Es relativo, no absoluto. Juicio rápido no es un concepto inconsistente con cierta tardanza, pero la demora no debe ser intencional ni opresiva.

En *Pueblo* v. *Rivera Tirado*, supra, transcurrieron cuatro meses y trece días desde que se comenzó el juicio y se dictó el fallo. Ocurrieron dieciocho suspensiones. Resolvimos que aun cuando la dilación fue excesiva, el apelante no objetó las suspensiones y recesos. Tampoco pudo demostrar perjuicio real y sustancial. Ello así, no encontramos motivo para conceder automáticamente la revocación solicitada a base de una aplicación laxa del concepto constitucional de juicio rápido.

A la luz de la norma prevaleciente debemos resolver si se le violó el derecho a juicio rápido al aquí apelante.

1. Duración de la tardanza

Hemos dicho antes que el juicio fue suspendido una sola vez y por veintiséis días. También apuntamos que no existe en autos explicación o justificación para dicha tardanza. El juicio concluyó tres días después de reiniciarse.

2. Razones para la dilación

Ante el silencio del récord ante nos, sobre la razón para un señalamiento tan tardío, debemos imputarlas a congestión del calendario, *Pueblo* v. *Rivera Tirado*, supra, lo que no constituye justa causa para la demora en la celebración del juicio en una causa penal. *Jiménez Román* v. *Tribunal Superior*, 98 D.P.R. 874, 883 (1970).

3. Si el acusado ha invocado oportunamente su derecho a juicio rápido

El acusado se opuso a la suspensión y al señalamiento tan distante. Apoyó su objeción en que la duración excesiva de la

suspensión daría lugar a contaminación del jurado. No reclamó expresamente violación a su derecho a juicio rápido.

4. Perjuicio resultante de la dilación

El perjuicio particular alegado por el apelante es que la suspensión dio lugar a que personas, familiares y amigos del occiso hablaran, por lo menos con un miembro del panel de jurado para que éste se inclinara en contra del acusado, y que el jurado se enteró de estos acercamientos; que el occiso era una persona muy conocida en el distrito; que los jurados estaban dispersos por el distrito, y que el periódico *El Vocero* publicó noticias sobre el caso. Específicamente nos llama la atención de los acercamientos a uno de los miembros del jurado, lo que motivó que el tribunal lo retirara del panel. En ese momento el tribunal de instancia llamó al jurado e inquirió sobre si estos hechos le afectaban, y ellos indicaron que no.

A pesar de eso, ya por lo menos algunos de los jurados se habían enterado del acercamiento por familiares y amigos de la víctima, con el propósito evidente de influenciar la mente de dicho jurado contra el acusado. (E.N.P., págs. 10–25.)

■ En este caso la demora en la continuación del juicio del acusado lesionó su derecho a un juicio rápido, justo e imparcial. Él sufrió un perjuicio real al suspenderse su caso durante veintiséis días en los cuales, entre otros posibles efectos, se dio oportunidad a que se hicieran unos acercamientos al jurado.

■ Aunque considerado el planteamiento en forma aislada, no incidió el tribunal al no disolver el jurado, resolvemos que, dentro de la totalidad de las circunstancias presentes, ello es un factor adicional que aumenta nuestras dudas fundadas sobre si el apelante recibió un trato justo y un juicio imparcial.

El efecto acumulativo de los errores, dentro de las circunstancias, da lugar a la revocación de las sentencias y la celebra-

ción de un nuevo juicio. *Pueblo* v. *Santos López*, 87 D.P.R. 624, 632 (1963).

■ El apelante no reclamó oportunamente su derecho a juicio por jurado en el caso de infracción al Art. 6 de la Ley de Armas. *Pueblo* v. *Laureano*, 115 D.P.R. 447 (1984). En adición dicha norma sólo tiene efectos prospectivos. Siendo la prueba suficiente se confirmará la sentencia por infracción al Art. 6 de la Ley de Armas.

Por la conclusión a la que hemos llegado, resulta innecesario discutir los restantes errores señalados por el apelante. ([5]) Basta señalar que no fueron cometidos.

Por los fundamentos expuestos, *se confirmará la sentencia por infracción al Art. 6 de la Ley de Armas y se revocarán las otras sentencias y se ordenará un nuevo juicio en los casos de asesinato en segundo grado e infracción al Art. 8 de la Ley de Armas.*

El Juez Asociado Señor Negrón García emitió opinión disidente. El Juez Asociado Señor Rebollo López concurre con la sentencia emitida en cuanto la misma decreta la revocación de las convicciones por los delitos de asesinato en segundo grado e infracción al Art. 8 de la Ley de Armas de Puerto Rico. Disiente de la sentencia emitida en tanto en cuanto la misma confirma la convicción por infracción al Art. 6 de la citada Ley de Armas en vista de lo resuelto en *Pueblo* v. *Laureano*, supra, y de que el apelante oportunamente reclamó su derecho a juicio por jurado, hecho que acepta el Procurador General.

---

([5]) Entre otros, que la prueba no estableció la culpabilidad del acusado más allá de duda razonable. Aunque el testimonio del testigo Matías Perea es vacilante y pudo haber dado lugar a una rebaja en la calificación del delito o la exoneración del apelante, el jurado rechazó la parte de su testimonio que resultaba exculpatoria. Nos abstendremos de intervenir para alterar el veredicto. La prueba de cargo era suficiente para establecer los elementos de los delitos de asesinato y portación ilegal de un arma de fuego.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Juan Ramos Álvarez fue acusado del delito de asesinato en primer grado y de violar los Arts. 8 y 6 de la Ley de Armas por hechos en que perdió la vida David Talavera Resto, ocurridos el 31 de diciembre de 1982, aproximadamente a las 9:00 P.M., frente al negocio La Esperanza, de Añasco, Puerto Rico.

Un jurado rindió veredicto de culpabilidad por el delito de asesinato en *segundo* grado y por el Art. 8 de la Ley de Armas. El tribunal lo declaró culpable por el Art. 6 de la Ley de Armas. Fue sentenciado a cumplir una pena de dieciocho (18) años de reclusión por el asesinato en segundo grado y a penas de tres (3) años, y seis (6) meses, respectivamente, por las convicciones a la Ley de Armas. Todas fueron impuestas de manera consecutiva.

No conforme, en apelación discute los señalamientos que examinaremos a continuación.

## I

[*PRIMERO*:—] Cometió error el Honorable Tribunal de Instancia al suspender el proceso, sobre la objeción de la defensa, luego de haber comenzado el desfile de la prueba de cargos, para que el Ministerio Público incluyera otro testigo, el cual tuvo la oportunidad de incluirlo con anterioridad, pero que sin razón alguna no lo había hecho.

El apelante Ramos Álvarez se queja de la suspensión decretada por el foro de instancia una vez comenzada la vista en su fondo.

Los autos reflejan que una vez constituido el jurado, el 12 de julio de 1983, el Ministerio Público empezó a desfilar su prueba con el testigo Roberto Macías. Al otro día finalizó su contrainterrogatorio. Entonces llamó como segundo testigo al policía José A. López. La defensa objetó. Alegó que no apa-

recía anunciado al dorso del pliego acusatorio. El tribunal de instancia sostuvo su planteamiento. Sin embargo, debido a que el fiscal informó que el testimonio de López, al igual que el del agente Armando González, eran esenciales, solicitó que fueran incluidos como testigos y se le concediera a la defensa término para prepararse. Esta vez la defensa se opuso a la suspensión a base de que el día anterior el Ministerio Público había anunciado estar preparado. Sin embargo, el tribunal suspendió el juicio para el 8 de agosto de 1983. (E.N.P., págs. 9–10.) Nuevamente la defensa objetó. Esta vez adujo que el señalamiento era muy "largo" y podía ocasionar que el jurado se contaminara.

El mandato contenido en la Regla 52 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, R. 52, de que al acusado se le entregará "una copia de la acusación con una lista de los testigos, antes de que se le requiera que formule alegación alguna", no es impedimento para que en casos meritorios —con sujeción a las salvaguardas procesales necesarias— un tribunal autorice el examen de algún testigo cuyo nombre no aparecía consignado al dorso de la acusación. Así lo habíamos resuelto desde *Pueblo* v. *Santiago,* 56 D.P.R. 109, 113–114 (1940), en que interpretamos el Art. 142 del anterior Código de Enjuiciamiento Criminal —predecesor de la Regla 52— reconociendo que su razón de ser es que el acusado pueda preparar adecuadamente su defensa. Véase 2 *Wharton's, Criminal Procedure* Sec. 256, pág. 54 (12ma ed. 1975).[1]

No incidió, pues, el tribunal de instancia al acceder a la solicitud del Ministerio Público para que se incluyera a los agentes López y González como testigos de cargo esenciales.

---

[1] A nivel federal no es requisito constitucional ni estatutario anotar los nombres de los testigos de cargo, excepto en casos de delitos que establecen la pena capital. *United States* v. *Seasholtz,* 435 F.2d 4, 7 (10mo Cir. 1970); *Edmondson* v. *United States,* 402 F.2d 809 (10mo Cir. 1968); *Córdova* v. *United States,* 303 F.2d 454 (10mo Cir. 1962); *Dean* v. *United States,* 265 F.2d 544 (8vo Cir. 1959).

No conforme con esa decisión, el apelante Ramos Álvarez se queja de la suspensión que se le concedió para prepararse y refutar las declaraciones de los referidos testigos. Cuestiona que ello fuera suficiente razón de peso. El argumento, aunque ingenioso no es persuasivo. Sostener su posición equivaldría a indirectamente resolver que la facultad discrecional concedida a los tribunales de permitir la inclusión de testigos adicionales es académica e inexistente. Ciertamente —una vez objetado el testimonio del testigo López— la suspensión era un imperativo constitucional y procesal. Que no fuera de su agrado, no lo convierte en erróneo.

En resumen, el planteamiento es de razonamiento circular. Primero se opuso a que declarara un testigo porque su nombre no había sido incluido al dorso de la acusación. Una vez autorizado, se opuso a la suspensión de la vista para que pudiera prepararse. Después de suspendida, objetó la fecha del señalamiento. Ahora en apelación alega que no eran testigos sorpresivos ni esenciales. El dilema procesal planteado fue adjudicado correctamente por el juez en el ejercicio de su discreción. No debemos intervenir.

[*SEGUNDO*:—] Cometió error el Honorable Tribunal de Instancia al suspender el proceso sobre la objeción de la defensa, para veintis[é]is días después de haber comenzado el desfile de la prueba de cargo y luego de que la defensa le señalara que una suspensión tan extensa podía dar lugar a que el jurado fuera indebidamente influenciado en contra del acusado apelante.

Este señalamiento lo evaluamos a la luz de la doctrina y análisis establecido en *Pueblo* v. *Rivera Tirado*, 117 D.P.R. 419 (1986). Allí aclaramos que el derecho a juicio rápido no es absoluto. Entre otros valores comunitarios persigue evitar toda demora intencional y opresiva. Siguiendo los pronunciamientos de *Barker* v. *Wingo*, 407 U.S. 514, 530 (1972), incorporamos a la etapa de un juicio ya comenzado los siguientes cuatro factores tradicionalmente considerados, al evaluar una

violación al derecho a juicio rápido, antes de su comienzo: (1) duración de la tardanza; (2) razones para la dilación; (3) reclamo oportuno de dicho derecho por el acusado, y (4) perjuicio resultante. Como método adjudicativo resolvimos que estos factores iban a ser considerados integralmente. Confrontémoslos con la situación de autos.

1. *Duración de la tardanza.* Una vez comenzado el juicio, y luego de haber declarado el primer testigo de cargo, se transfirió la vista desde el 13 de julio hasta el 8 de agosto de 1983, esto es, un total de veintiséis (26) días. Aunque en apariencia el término es extenso, a poco examinemos y excluyamos los días feriados, (2) realmente el período cubrió solamente quince (15) días laborables. No creemos que ese término, per se sea irrazonablemente largo.

2. *Razones para la dilación.* El juicio fue suspendido por el tribunal con el propósito de que la defensa pudiera prepararse para poder confrontar a los dos (2) testigos de cargo cuyos nombres no aparecían incluidos al dorso de la acusación. Las causas de la suspensión fueron la solicitud del fiscal y el planteamiento del propio apelante. En ausencia de otras razones en el récord, conforme *Pueblo* v. *Rivera Tirado*, supra, hemos de presumir que la selección de la fecha para la continuación fue afectada por la congestión del calendario judicial. Así expuesto, la suspensión ciertamente no configura una demora intencional con el propósito de estorbar la defensa, y menos, de carácter opresivo.

3. *Si el acusado ha reclamado el derecho oportunamente.* El apelante objetó y oportunamente planteó que la suspensión era larga. Tiene a su favor este factor. Sin embargo, ello no es suficiente para determinar una violación al derecho a juicio rápido.

---

(2) Correspondientes a los sábados y domingos, 17 de julio, día de Luis Muñoz Rivera observado el lunes 18, 25 de julio, Constitución E.L.A., y 27 de julio, día de José Celso Barbosa.

4. *Perjuicio resultante de la dilación*. Se aduce que la suspensión le causó ansiedad y preocupación debido a la etapa del proceso. El apelante Ramos Álvarez nos dice que ya "sabía qui[é]nes lo iban a juzgar; qu[é] tipo de evidencia se estaba presentando en su contra; que se iban a presentar dos testigos m[á]s en su contra, en adición a los trece que ya le habían sido informados; que un sinnúmero de jurados habí[a] manifestado que conocí[a] al occiso y a su familia; que a él no lo conocían, pues él hacía poco tiempo que había venido de Estados Unidos; que el occiso era una persona muy conocida en el distrito; que los jurados estaban dispersos por el distrito y alguien les podía hablar en su contra; que en el periódico El Vocero se estaban publicando noticias del caso y los jurados podían ser influenciados por ellos; [y] que el Juez podía estar en su contra". Alegato, pág. 16.

Aun así, admite que se encontraba en libertad bajo fianza y no sufrió daño alguno por motivo de encarcelación. No nos convence la alegación sobre ansiedad y preocupación. Las razones que invoca son insuficientes y no guardan relación lógica con su reclamo. El perjuicio reconocido es aquel visto a la luz de los intereses que protege el derecho a juicio rápido, a saber: (a) el encarcelamiento indebido y opresivo anterior al juicio; (b) minimizar la ansiedad y preocupación que conlleva un juicio público, y (c) reducir las posibilidades de que una tardanza menoscabe los medios de defensa del acusado. *Pueblo* v. *Rivera Tirado*, supra.

Las circunstancias que nos expone inevitablemente las conocía desde antes o como resultado de la acusación (*v.g.* quienes lo iban a juzgar, dos testigos adicionales y los jurados). En cuanto al argumento de que el rotativo *El Vocero* estaba publicando noticias del caso, forzosamente, nada tiene que ver con la suspensión. Tales noticias se publican durante el proceso. Finalmente, no merece análisis serio la alusión de que "el Juez podía estar en su contra".

Un sistema de justicia criminal no puede administrarse bajo esa óptica. La suspensión aquí decretada tuvo el propósito de que pudiera preparar mejor su defensa. Como todo acto, tiene sus efectos positivos y negativos. En el primero, lejos de perjudicarle, le benefició. En cuanto al segundo, no ha demostrado que se hayan menoscabado sus medios de defensa.

Respecto a que la suspensión dio lugar a que la viuda del occiso y un amigo trataran de influenciar al jurado José Amador Acosta, basta señalar que una vez advertido el tribunal, éste investigó cabalmente la situación, separó al miembro del panel de jurados y oportunamente lo relevó y sustituyó por un jurado suplente. No compartimos la proposición de que la suspensión fue la causa directa de los acercamientos. La dinámica humana es más compleja. El tratar de influenciar a un miembro del jurado es un peligro potencial que sólo puede evitarse con una vigilancia continua o el secuestro del panel. Razones obvias de economía, pero sobre todo de inconvenientes a los jurados, impiden instaurar siempre esa solución. Por ende, el acercamiento pudo y puede ocurrir en cualquier momento. Concluimos, sin embargo, que mientras más rápido finalice el juicio cronológicamente se reduce ese riesgo.

Finalmente, no tiene razón el apelante Ramos Álvarez al argumentar que hubo un perjuicio y se extendió a todo el panel de jurados, porque sus miembros tuvieron conocimiento de los acercamientos de que fue objeto el jurado Amador Acosta. El récord revela lo contrario. Del interrogatorio e investigación del juez surge que de lo único que se enteraron fue de los acercamientos. No conocieron los detalles. Todos afirmaron que en modo alguno este incidente aislado les había afectado. Reiteraron que podían rendir una decisión imparcial y un veredicto producto del examen de la prueba desfilada.

[*TERCERO*:—] Cometió error el Honorable Tribunal de Instancia al no disolver el jurado que intervino en el proceso luego de percatarse personalmente y demostrársele que uno de los miembros del cuerpo llevó información al cuerpo en

pleno en cuanto a unos acercamientos que le habían hecho en contra del acusado, amigos y familiares de la víctima, durante el período de tiempo que el proceso estuvo suspendido.

[*CUARTO*:—] Cometió error el Honorable Tribunal de ·[I]nstancia al no disolver el jurado al percatarse personalmente que al regresar en una ocasión el panel de jurados a ·sala, uno de sus miembros saludó a uno de los miembros de ·la familia del occiso haciéndole una señal con dos dedos de la mano, replicándole éste con una sonrisa bien marcada.

Por estar relacionados entre sí los evaluaremos conjuntamente.

Los hechos que motivan ambos señalamientos tienen su génesis, según anticipado, en que la viuda del occiso y otra persona nombrada Antonio Lugo se acercaron al jurado Amador Acosta con el aparente propósito de inclinar su votación en contra del acusado. Amador Acosta en forma diligente lo informó al juez de instancia al reanudarse el proceso. Éste le hizo un interrogatorio extenso. Posteriormente lo relevó y sustituyó.

El tribunal además convocó a todos los demás miembros del jurado e inquirió cuánto conocimiento tenían respecto a este incidente. Preguntó, además, si ello les impedía tomar una decisión en el caso que no fuera el producto de un análisis de la prueba. Todos coincidieron en que Amador Acosta no elaboró ni entró en detalles, sino que sólo les informó los lugares donde le habían hecho los acercamientos y las personas involucradas. Afirmaron que ello no les impedía juzgar y rendir un veredicto justo e imparcial. En esta investigación el fiscal intervino y preguntó. Sin embargo, la representación legal del apelante no quiso hacer ninguna pregunta. (T.E. Parcial, pág. 16.) En ese momento tuvo la oportunidad de investigar si se había afectado la imparcialidad de algunos de los miembros del jurado. No lo hizo. Ahora, en esta etapa apelativa, intenta beneficiarse del incidente atribuyéndole un alcance que no tiene. En estas circunstancias, es especulativo e inmeritorio su argumento de que el silencio desplegado por los restantes ju-

rados —una vez le contestaron en conjunto al juez de instancia que el incidente no les había afectado— era indicativo de un prejuicio implícito. Repetimos, pudiendo hacerlo, no los interrogó.

Conforme *Pueblo* v. *Figueroa Rosa,* 112 D.P.R. 154 (1982), y *Pueblo* v. *Prados García,* 99 D.P.R. 384 (1970), corresponde a todo acusado rebatir la presunción de que un jurado ha basado su veredicto en la prueba, y no en hechos extraños o bajo indebida influencia o presión indebida. Aquí, al igual que en *Pueblo* v. *Prados García,* supra, pág. 394, "[n]o se probó que se afectara la imparcialidad del jurado y menos todavía que lo relatado hubiese privado a los miembros del jurado en este caso del ejercicio de la razón y de su juicio sereno al juzgar los hechos ante ellos". Después de todo, el "veredicto del Jurado, como la sentencia del juez, es acto investido con la alta dignidad de la magistratura en la función juzgadora de la conducta de los hombres, y no es para echarse a un lado con liviandad e indiferencia". *Pueblo* v. *Figueroa Rosa,* supra, pág. 159.

No podemos dejar sin efecto un veredicto a base de una premisa no demostrada de perjuicio implícito o formulada en especulaciones. No existe prueba que nos permita concluir que la escasa información que llegó a los miembros del jurado sobre Amador Acosta influyó en el veredicto rendido. [3]

[*QUINTO*:—] Cometió error el Honorable Tribunal de Instancia al negarse a darle al jurado instrucciones sobre posesión y portación incidental de un arma de fuego, luego de haber sido las mismas debidamente solicitadas.

---

[3] Tampoco nos convence el argumento elaborado en un gesto de un miembro del jurado a una persona desconocida del público. De la exposición narrativa de la pueba no surge que el saludo haya sido a un familiar del occiso. (E.N.P., págs. 28–29.) El juez de instancia observó el incidente y determinó que era inconsecuente y no lesionaba los derechos del acusado. A menos que sustituyamos los estrados, hemos de respetar esa determinación.

El apelante invoca la doctrina de *posesión y portación incidental de un arma* como eximente de responsabilidad en las condenas por infringir la Ley de Armas. Aunque nos hace una exposición doctrinaria correcta, yerra en su aplicación. En el caso de autos la prueba no justificaba una instrucción a esos efectos. Por el contrario, demostró una posesión y portación en clara violación de la ley. *Pueblo* v. *Velázquez Caraballo,* 110 D.P.R. 369, 374 (1980).

La evidencia demuestra que el apelante Ramos Álvarez privó de la vida a David Talavera Resto sin justificación ni en defensa propia. Ello ocurrió mientras Talavera Resto se encontraba sentado dentro de su automóvil. Ramos Álvarez le quitó el revólver y le hizo cinco (5) disparos. La autopsia reveló un 0.27% de alcohol en la sangre y que algunos disparos penetraron la espalda. (E.N.P., pág. 6 y Protocolo de Autopsia.) Luego Ramos Álvarez se llevó el arma a casa de su hermano. Al rato, cuando el policía López llegó buscando información sobre la muerte, se la entregó. (E.N.P., pág. 26.) No hay prueba de que momentos antes de ser ultimado, David Álvarez Resto actuara en forma amenazante o peligrosa hacia el apelante o su hermano.

Estos hechos no configuran una posesión o portación incidental, *Pueblo* v. *Mojica Márquez,* 108 D.P.R. 102, 104 (1978) —ejercicio de una legítima defensa propia—; *Pueblo* v. *Borges,* 23 D.P.R. 524 (1916) —salirse de una finca para entregar un arma a un policía—; *Pueblo* v. *Moll,* 28 D.P.R. 783 (1920) —acusado arrebató un arma a otro durante un tumulto para disparar al aire y así pedir auxilio a la Policía—, y *Pueblo* v. *Arana,* 72 D.P.R. 821 (1951) —acusado encontró un arma, la retuvo un tiempo y después voluntariamente la llevó y entregó a la Policía. Toda esta casuística refleja un trasfondo fáctico de posesión y portación momentánea con un propósito legal. Los hechos del caso de autos no guardan ninguna relación análoga en qué sostener este planteamiento.

[*SEXTO:*—] Cometió error el Honorable Tribunal de instancia al negarse a que la acusación por infracción al Art. 6 de la Ley de Armas pasara a ser considerada por el jurado.

En *Pueblo* v. *Laureano*, 115 D.P.R. 447, 448–449 (1984), a tono con el Art. 12 del Código Penal, 33 L.P.R.A. sec. 3044 —que establece como delitos graves aquellos que conlleven penas de más de seis (6) meses de cárcel— resolvimos que los acusados de violar los Arts. 2 y 6 de la Ley de Armas, 25 L.P.R.A. secs. 412 y 416 —que aparejan penas de un año de reclusión— y lo reclamen oportunamente, tienen derecho a que sus casos sean ventilados ante jurado.

En el presente caso el juez de instancia erróneamente se negó a que la denuncia por el Art. 6 de la Ley de Armas pasara al jurado. El pedido se hizo en tiempo. Concluimos que el error fue cometido. El Procurador General se allana. En consecuencia, la convicción y sentencia basada en el Art. 6 debe revocarse.

[*SEPTIMO:*—] Cometió error el Honorable Tribunal de Instancia al permitir que el Ministerio Público utilizara lenguaje grocero y ofensivo contra la persona del acusado y de los testigos al dirigirse a los señores del jurado.

El apelante se queja de que durante el informe al jurado, el fiscal se refiriera a él diciendo " 'no dejen que ese criminal y matón se quede fuera' ". Aduce además que aludió al testigo de *cargo* Matías Perea como " 'indecente' ". (E.N.P., pág. 31.) No le asiste la razón.

*Primero*, "en nuestra jurisdicción . . . en los informes al jurado, tanto defensa como fiscal tienen amplia libertad para comentar la evidencia y que aun las vituperaciones e invectivas, si bien constituyen un recurso de pobre estilo, no vician el veredicto si, como en el presente caso, no tienen la dimensión de factor determinante del mismo". *Pueblo* v. *Dones Arroyo*, 106 D.P.R. 303, 312 (1977). *Segundo*, un error de manifestaciones impropias por el fiscal no conlleva automáticamente la revocación, salvo que se demuestre que el veredicto

fue influenciado por la conducta impropia. *Tercero*, según antes señalado, un veredicto no puede atacarse bajo la premisa de prejuicio *implícito*. Debe demostrarse la existencia de prejuicio real. Véase *Pueblo* v. *Figueroa Rosa*, supra. Y *cuarto*, las expresiones de "criminal y matón" eran compatibles con el cargo de asesinato en primer grado por el cual se le juzgaba. (⁴)

En cuanto a tachar de "indecente" al testigo Matías Perea, basta recordar que fue presentado por el mismo fiscal, esto es, era de cargo. La expresión, en vista de su testimonio, fue de poco gusto. Si algún impacto pudo tener fue afectar su credibilidad y debilitar el caso del Ministerio Fiscal.

[*OCTAVO:*—] Cometió error el Honorable Tribunal de Instancia al no velar y salvaguardar por que al apelante se le celebrara un juicio justo e imparcial.

Este señalamiento intenta imprimirle sustancia a los anteriores, convirtiendo lo cuantitativo en cualitativo.

Una vez ubicado en su correcta perspectiva y depurado el proceso "[d]ista mucho éste de ser el caso apropiado para aplicar la regla de efecto acumulativo de irregularidades procesales que daña el debido proceso. *Pueblo* v. *González Colón*, 110 D.P.R. 812, 831 (1981). No hay erosión perceptible, ni aislada ni en conjunto, de los derechos del acusado". *Pueblo* v. *Romero Rodríguez*, 112 D.P.R. 437, 442 (1982). (⁵)

---

(⁴) En *Pueblo* v. *Hernández Santiago*, 97 D.P.R. 522, 533 (1969) —en que el fiscal se refirió al acusado como "asesino"— dijimos que ello no era indicio de que se perjudicaran sus derechos sustanciales ni que el veredicto estuviera influenciado por el uso de tal lenguaje.

(⁵) No vemos cómo pudo afectarle el que una miembro del jurado, sin razón, se ausentara del proceso y fuera sustituida por un suplente. A ello precisamente responde la existencia de jurados suplentes. La orden del tribunal de instancia para que mostrara causa por la cual no debía ser encontrada incursa en desacato es materia ajena al veredicto. Nuevamente declinamos especular.

Sobre las instrucciones tendentes a eliminar cualquier prejuicio surgido en el proceso por motivo de los acercamientos de que fue objeto el jurado Amador Acosta y sobre las manifestaciones impropias del fiscal en su in-

[*NOVENO:*—] Que el veredicto rendido no se ajusta a la evidencia desfilada, pues ésta no estableció la culpabilidad del apelante más allá de toda duda razonable.

Evaluada objetivamente la prueba testifical y documental presentada, coincidimos con el jurado en que la misma sostiene la culpabilidad del acusado más allá de toda duda razonable. No podemos intervenir y variar esa apreciación. *Pueblo* v. *Cabán Torres*, 117 D.P.R. 645 (1986).

[*DÉCIMO:*—] Cometió error el Honorable Tribunal de Instancia al declarar sin lugar una moción en solicitud de que se dictara sentencia con atenuantes en cuanto al delito de asesinato en segundo grado, a[u]n cuando dictó sentencia en el Art. 8 de la Ley de Armas con ellos.

[*UNDÉCIMO:*—] Abusó de su discreción el Honorable Tribunal de Instancia al imponer las sentencias al apelante en forma consecutiva.

Ambos carecen de méritos. No incidió al tribunal a quo negándose a dictar sentencia con atenuantes en cuanto al delito de asesinato. Se limitó a una pena de 18 años fija. Pudo haberla dictado con agravantes de 30 años según lo solicitó el Ministerio Fiscal y no lo hizo. En torno al planteamiento de que abusó de su discreción al determinar que las sentencias fueran consecutivas, realmente el apelante no lo elabora. Correspondía al tribunal sentenciador determinar, como lo hizo, que los hechos lo justificaban. *Pueblo* v. *Matos Pretto*, 93

---

forme, nada hay en los autos indicativo de que el apelante las solicitara. Sólo tenemos constancia de las que se pidieron en la moción de 15 de agosto de 1983. Si algo refleja la exposición narrativa de la prueba, es que el tribunal intervino y aclaró el incidente del jurado Amador Acosta. El apelante no nos ha puesto en condiciones de evaluar la suficiencia de las instrucciones. *Pueblo* v. *Najul Bez*, 111 D.P.R. 417 (1981).

Hemos de insistir que no podemos presumir que el jurado es un cuerpo colegiado susceptible a que el menor contacto, incidente o irregularidad afecte su ánimo de forma tal que le impida rendir un veredicto justo e imparcial. *Pueblo* v. *Dones Arroyo*, 106 D.P.R. 303, 311 (1977); *Pueblo* v. *Rivera Romero*, 83 D.P.R. 471, 483 (1961).

D.P.R. 113, 132 (1966) ; *Pueblo* v. *González,* 97 D.P.R. 541, 544 (1969).

Por los fundamentos expuestos disentimos. Sólo revocaríamos la sentencia condenatoria por infracción al Art. 6 de la Ley de Armas. Confirmaríamos las restantes.