ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>JIOVAN F. ORTIZ SOTO<br><br>Apelante | KLAN202401130 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Civil. Núm.<br>J VI2023G0017<br>J IS2023G0025 al 32<br><br>Sobre:<br>Art. 93B C.P.<br>Art. 130 (4) C.P.<br>Art. 131 (4) C.P. |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Juez Barresi Ramos y el Juez Sánchez Báez[1]

Juez Ponente, Sánchez Báez

**SENTENCIA**

En San Juan, Puerto Rico, a 9 de marzo de 2026.

Compareció ante nos el Sr. Jiovan F. Ortiz Soto (en adelante, "señor Ortiz Soto" o "apelante"), mediante un recurso de *Apelación* presentado el 17 de diciembre de 2024. Nos solicitó la revisión de la *Sentencia* que se dictó el 21 de noviembre de 2024, por el Tribunal de Primera Instancia, Sala Superior de Ponce. Mediante esta, el Foro Primario condenó al apelante a una pena de noventa y nueve (99) años por infracción al Artículo 93 (b) del Código Penal de 2012, Ley Núm. 146-2012, 33 LPRA sec. 5142 (b), a sesenta y dos (62) años y seis (6) meses por cuatro (4) infracciones al Artículo 130 (a) del Código Penal, 33 LPRA sec. 5191, y a sesenta y dos (62) años y seis meses por cuatro (4) infracciones al Artículo 131 del Código Penal, 33 LPRA sec. 5192, a ser cumplidas de forma concurrente entre sí.

Por los fundamentos que expondremos a continuación, **se confirma** la *Sentencia* apelada.

---

[1]Mediante la Orden Administrativa OATA-2025-002 emitida el 9 de enero de 2025 se designó al Juez Isaías Sánchez Báez en sustitución de la Jueza Monsita Rivera Marchand.

Número Identificador

RES2026 _____

**-I-**

Por hechos ocurridos entre diciembre de 2022 y junio de 2023, el Pueblo de Puerto Rico presentó nueve (9) denuncias contra el señor Ortiz Soto. Luego de la determinación de causa probable para acusar, el Ministerio Público presentó las acusaciones por infracción al Artículo 93 (b) del Código Penal, el cual tipifica el delito de asesinato en primer grado, en su modalidad de asesinato estatutario. Igualmente, se le acusó por cuatro (4) infracciones al Artículo 130 (a) del referido Código, y cuatro (4) infracciones al Artículo 131, los cuales tipifican los delitos de agresión sexual e incesto. En específico, se le acusó de:

> [...][A]llá en o para el día 7 de junio de 2023[,] y en Guayanilla[,] Puerto Rico, [...] al perpetrar el delito de agresión sexual y maltrato[,] le ocasionó la muerte a la infante [identificada por sus siglas como ATOQ (en adelante, "ATOQ)] de 2 años de edad, consistente dichos actos en que el aquí imputado siendo el padre biológico y responsable del bienestar de la menor utilizando fuerza física y violencia, la agredió sexual y físicamente[,] ocasionándole golpes y contusiones en diferentes partes del cuerpo hasta provocarle la muerte.[2]

Tras varios asuntos procesales, surge de la *Minuta* del 31 de octubre de 2023 que se celebró una vista de supresión de evidencia, con el propósito de dilucidar la admisibilidad de una alegada confesión hecha por el apelante. Mediante *Resolución* del 6 de noviembre de 2023, el Foro Primario declaró *No Ha Lugar* la supresión de la confesión del señor Ortiz Soto, y concluyó que este renunció libre y voluntariamente a su derecho contra la autoincriminación.

Más adelante, el 8 de abril de 2024, se celebró una vista con el propósito de marcar la evidencia que sería utilizada en el juicio. Surge de la respectiva *Minuta* que el Ministerio Público informó haber hablado con la defensa sobre la inclusión de una testigo cuyo nombre desconocía. Debido a que advino en conocimiento de su

---

[2] *Véase*, Autos Originales, Tomo I, *Acusación*.

identidad, este solicitó que se incluyera a la fotoperiodista, la Sra. Isabel Ortiz Pérez (en adelante, "señora Ortiz Pérez" o "fotoperiodista"), quien tomó un video para la televisión, en el cual el señor Ortiz Soto hizo unas expresiones hacia la prensa, luego de que se le determinara causa probable para su arresto. El Ministerio Público indicó que le suministró el referido video a la defensa en el descubrimiento de prueba. No obstante, debido a que ya se le había tomado juramento al jurado, la defensa se opuso.

Posteriormente, surge de la *Minuta* de la vista celebrada el 10 de abril de 2024, que el Tribunal de Primera Instancia escuchó los planteamientos de las partes y permitió la inclusión de la fotoperiodista como testigo, al igual que el video. El Foro Primario razonó que su inclusión no laceraba el derecho del señor Ortiz Soto a un juicio justo e imparcial, y le concedió un término al apelante para prepararse.

Así las cosas, el 30 de abril de 2024, el Ministerio Público comenzó a desfilar la prueba de cargo. Este presentó doce (12) testigos de cargo, al igual que la prueba documental y física. Por otro lado, la defensa presentó dos (2) testigos.

Durante el juicio, surge de la *Minuta* del 23 de septiembre de 2024, que la defensa reprodujo su solicitud de supresión de la confesión del señor Ortiz Soto al solicitar una vista al amparo de la Regla 109 de las de Evidencia, *supra*, para una determinación preliminar de su admisibilidad.[3] No obstante, tras escuchar los planteamientos de las partes, el Foro Primario le preguntó a la defensa "si [había] algo nuevo que no [hubiese] sido atendido en la supresión de confesión".[4] En respuesta, la defensa indicó que tenía derecho a objetar dicha prueba. Siendo así, el Tribunal de Primera Instancia resolvió que se regiría por la ley del caso. En específico,

---

[3] *Véase*, Autos Originales, Tomo II, *Minuta* del 23 de septiembre de 2024.
[4] *Íd.*, pág. 3.

concluyó lo siguiente: "[s]i hay algo adicional que no se planteó, un descubrimiento posterior, se entraría a esta vista. Si es para relitigar lo mismo cuando ya es final y firme, no tiene mayor jerarquía".[5]

Por otra parte, surge de la *Minuta* del 25 de septiembre de 2024 que, en ausencia del jurado y a solicitud de la defensa, se celebró una vista al amparo de la Regla 109 de las de Evidencia, 32 LPRA Ap. VI, R. 109, con el propósito de autenticar el video tomado por la fotoperiodista. Consecuentemente, el Tribunal de Primera Instancia declaró que, para su autenticación, era suficiente que la referida testigo hubiese declarado que tomó el video en controversia, por lo que admitió el mismo como prueba ilustrativa de lo declarado por el agente Meléndez Álvarez.

Así las cosas, aquilatada la prueba presentada en el juicio, el Jurado encontró *culpable*, de forma unánime, al señor Ortiz Soto por cada delito imputado. De este modo, el Tribunal de Primera Instancia dictó la *Sentencia* apelada, mediante la cual condenó al señor Ortiz Soto a una pena de noventa y nueve (99) años de cárcel por el delito de asesinato en primer grado, sesenta y dos (62) años y seis (6) meses de cárcel por cada infracción al delito de agresión sexual, y sesenta y dos (62) años y seis (6) meses de cárcel por cada infracción al delito de incesto, a ser cumplidos de forma concurrentes entre sí.

Inconforme, el 17 de diciembre de 2024, el apelante presentó el recurso de epígrafe. En este, señaló la comisión de los siguientes errores:

A. ERRÓ EL TPI AL ADMITIR COMO EVIDENCIA UN VIDEO DE PRENSA SOBRE ALEGADAS EXPRESIONES DEL APELANTE, QUE NO FUERON DESCUBIERTAS DURANTE LA REGLA 95 Y TAMPOCO SE ANUNCIÓ COMO PRUEBA A SER UTILIZADA POR EL ESTADO DURANTE EL JUICIO.

B. ERRÓ EL TPI AL PERMITIR LA INCLUSIÓN DE UNA TESTIGO DE CARGO, UNA VEZ INICIADO EL JUICIO POR JURADO, Y ADMITIR SU TESTIMONIO SOBRE

---

[5] *Íd.*, pág. 4.

UNAS ALEGADAS MANIFESTACIONES DEL APELANTE. ESTO ANTERIOR, SIN SER DEBIDAMENTE NOTIFICADO A LA DEFENSA Y A PESAR DE HABER SIDO OPORTUNAMENTE REQUERIDO, TANTO EN LA VISTA PRELIMINAR COMO DURANTE EL PROCESO DE DESCUBRIMIENTO DE PRUEBA.

C. ERRÓ EL TPI AL ADMITIR COMO EVIDENCIA UN VIDEO DE PRENSA SOBRE SUPUESTAS EXPRESIONES DEL APELANTE, A PESAR DE LA OPORTUNA OBJECIÓN DE LA DEFENSA SOBRE EL RIESGO DE CREAR CONFUSIÓN EN EL JURADO, CAUSAR PERJUICIO INDEBIDO Y/O CONSTITUIR UN COMENTARIO SOBRE EL DERECHO CONSTITUCIONAL A GUARDAR SILENCIO.

D. ERRÓ EL TPI AL NO CELEBRAR UNA VISTA AL AMPARO DE LA REGLA 109 DE LAS DE EVIDENCIA, ANTES DE QUE EL AGENTE INVESTIGADOR DECLARARA ANTE EL, JURADO SOBRE UNA SUPUESTA CONFESIÓN DEL APELANTE, EN VIOLACIÓN A SU DERECHO CONTRA LA AUTOINCRIMINACIÓN, A LA GARANTÍA DE JUICIO JUSTO E IMPARCIAL Y AL DEBIDO PROCESO DE LEY.

E. ERRÓ EL TPI AL ADMITIR EN EVIDENCIA UNA CONFESIÓN DEL ACUSADO AUN CUANDO NO SE ESTABLECIÓ QUE FUERA REALIZADA DE FORMA VOLUNTARIA, CONCIENTE E INTELIGENTE, EN VIOLACIÓN A SU DERECHO CONTRA LA AUTOINCRIMINACIÓN CONSAGRADO EN EL ARTÍCULO II SECCIÓN 11 DE LA CONSTITUCIÓN DE PUERTO RICO.

F. ERRÓ EL JURADO AL ENCONTRAR CULPABLE AL APELANTE EN VIRTUD DE UNA PRUEBA QUE NO DERROT[Ó] LA PRESUNCIÓN DE INOCENCIA Y MUCHO MENOS ESTABLECIÓ SU CULPABILIDAD MÁS ALL[Á] DE DUDA RAZONABLE.

Por otra parte, el 21 de enero de 2026, el Ministerio Público, representado por la Oficina del Procurador General de Puerto Rico (en adelante, "Procurador"), presentó su *Alegato [del] Pueblo de Puerto Rico.*

Con el beneficio de la comparecencia de ambas partes y la transcripción de la prueba oral, así como los autos originales, procedemos a exponer la normativa jurídica aplicable al caso ante nuestra consideración.

**-II-**

**A. Presunción de inocencia y duda razonable**

La Constitución de Puerto Rico reconoce en la Sección 11 del Artículo II el derecho fundamental de la presunción de inocencia. Const. PR art. II, sec. 11. Esto es que un acusado no tiene la

obligación de presentar prueba en su defensa o de que es inocente. *Pueblo v. Meléndez Monserrate*, 214 DPR 547, 559 (2024). Entiéndase, le corresponde al Estado la obligación de presentar evidencia y de cumplir con la carga de la prueba para establecer la culpabilidad del acusado. *Pueblo v. Irizarry*, 156 DPR 780, 786-787 (2002). A los fines de rebatir esa presunción, las reglas 110 de Procedimiento Criminal y de Evidencia requieren que la culpabilidad de una persona acusada sea probada más allá de duda razonable. 34 LPRA Ap. II, R. 110 y 32 LPRA Ap. VI, R. 110. Para cumplir con ese estándar, y por consiguiente controvertir la presunción constitucional, el Ministerio Público tiene que presentar prueba suficiente y satisfactoria sobre: (1) cada uno de los elementos del delito, (2) su conexión con el acusado y (3) la intención o negligencia criminal de este. *Pueblo v. Meléndez Monserrate*, supra, pág. 560. Cumplir con esa máxima es un imperativo del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786.

Ahora bien, el estándar probatorio de más allá de duda razonable no requiere que se tenga que probar el caso criminal con certeza matemática. *Pueblo v. Toro Martínez*, 200 DPR 834, 856 (2018); *Pueblo v. Bigio Pastrana*, 116 DPR 748, 761 (1985). Lo que nuestro ordenamiento jurídico requiere es prueba suficiente y satisfactoria, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido. *Pueblo v. Toro Martínez*, supra. Por ende, la duda razonable que impide encontrar culpable al acusado no es una mera duda especulativa o imaginaria, o cualquier duda posible; es la insatisfacción racional de la conciencia del juzgador con la prueba presentada producto de todos los elementos de juicio del caso. *Íd.*, Véase, además, *Pueblo v. Irizarry*, supra, pág. 788; *Pueblo v. Bigio Pastrana*, supra, pág. 761. Es decir, "la duda razonable debe ser el resultado de la consideración serena, justa e imparcial de la

totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación". *Pueblo v. Irizarry*, supra. Como bien dispuso el Tribunal Supremo: "En concreto, la duda razonable existe cuando el juzgador de los hechos siente en su conciencia insatisfacción o intranquilidad con la prueba de cargo presentada". *Pueblo v. García Colón I*, 182 DPR 129, 175 (2011). De igual modo ocurre "cuando el juzgador queda insatisfecho con la prueba presentada". *Pueblo v. Santiago,* 176 DPR 133, 142 (2009).

La determinación de si se probó la culpabilidad del acusado más allá de duda razonable es revisable en apelación. Ahora bien, en esa delicada función revisora se debe tener presente que "la apreciación de la prueba corresponde, en primera instancia, al foro sentenciador por lo cual los tribunales apelativos sólo intervendremos con dicha apreciación cuando se demuestre la existencia de pasión, prejuicio, parcialidad o error manifiesto". *Pueblo v. Irizarry*, supra, págs. 788-789. Véase, además, *Pueblo v. Maisonave Rodríguez*, 129 DPR 49 (1991). Asimismo, podremos intervenir cuando la apreciación de la prueba no concuerde con la realidad fáctica o esta sea inherentemente imposible o increíble. *Pueblo v. Irizarry*, supra, pág. 789.

Esta norma se fundamenta en el hecho de que "los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia". *Pueblo v. Acevedo Estrada*, 150 DPR 84, 99 (2000).

De otro lado, nuestro ordenamiento jurídico no requiere una cantidad específica de testigos para probar la culpabilidad de un acusado más allá de duda razonable. *Pueblo v. Toro Martínez*, supra, pág. 859. Al contrario, el testimonio de un testigo por sí solo, de ser creído, es suficiente para sostener un fallo condenatorio aun cuando no fue un testimonio perfecto. Le corresponde al foro primario

resolver los asuntos de credibilidad de un testigo cuando haya partes de su testimonio que sean aceptables. *Íd.*, pág. 860. Véase, además, *Pueblo v. Chévere Heredia,* 139 DPR 1, 15-16 (1995). De ese modo, si un testigo se contradice, lo que está en juego es su credibilidad y es al foro primario a quien le corresponde resolver el valor probatorio de su testimonio. *Pueblo v. Toro Martínez*, supra, pág. 861. Adviértase que el testimonio perfecto no existe, y en lugar de ser indicativo de la verdad, es altamente sospecho, pues generalmente es producto de fabricación. *Pueblo v. Cabán Torres*, 117 DPR 645, 656 (1986).

**B. Juicio por Jurado**

Es altamente conocido que toda persona acusada de un delito grave tendrá derecho a ser juzgado por un jurado imparcial compuesto por doce (12) miembros. En específico, la Constitución de Estados Unidos dispone que, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed [...]. Emda. VI, Const. EEUU, LPRA, Tomo 1. De igual forma, el Artículo II, Sección 11, de la Constitución de Puerto Rico reza de la siguiente manera:

> En todos los procesos criminales, el acusado disfrutará del derecho a un juicio rápido y público, a ser notificado de la naturaleza y causa de la acusación recibiendo copia de la misma, a carearse con los testigos de cargo, a obtener la comparecencia compulsoria de testigos a su favor, a tener asistencia de abogado, y a gozar de la presunción de inocencia.
>
> En los procesos por delito grave el acusado tendrá derecho a que su juicio se ventile ante un jurado imparcial compuesto por doce vecinos del distrito, quienes podrán rendir veredicto por mayoría de votos en el cual deberán concurrir no menos de nueve.

Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1.[6]

---

[6] Cabe destacar que, en *Pueblo v. Torres Rivera II,* 204 DPR 288, 306-307 (2020), el Tribunal Supremo de Puerto Rico adoptó la norma establecida por la Corte Suprema de Estados Unidos, en *Ramos v. Louisiana,* 590 US 83 (2020), mediante la cual se aclaró que la Constitución Federal requiere unanimidad en el veredicto.

Ahora bien, el veredicto que emite un jurado es merecedor del mismo respeto y deferencia que le asiste al fallo emitido por un tribunal de derecho. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 914 (2024). Ello obedece a que es el jurado "el más indicado para otorgar credibilidad y dirimir conflictos de prueba", ya que "[s]on estos quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos". *Pueblo v. Ruiz Ramos*, 125 DPR 365, 400-401 (1990), citando a *Pueblo v. Pellot Pérez*, 121 DPR 791, 806 (1988). Es por ello que esta Curia solo intervendrá con la apreciación de los miembros del Jurado cuando medie error manifiesto, pasión, perjuicio o parcialidad. *Pueblo v. Negrón Ramírez*, supra, págs. 913-914; *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995).

Cónsono con lo antes esbozado, el Tribunal Supremo de Estados Unidos le ha otorgado gran deferencia a los veredictos que rinde un Jurado. A modo de ejemplificar, en *Jackson v. Virginia*, 443 US 307, 318-319 (1979), dicho Foro expresó lo siguiente:

> *After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Woodby v. INS, 385 U.S., at 282 (emphasis added). Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Johnson v. Louisiana, 406 U.S., at 362. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.*

De este modo, este Foro Apelativo solo intervendrá con la apreciación de un jurado que haya resultado en un veredicto condenatorio cuando de la prueba surjan "serias dudas, razonables

y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR, 545, 551 (1974). Por tanto, no se descartarán, ni se sustituirán, las determinaciones del jurado de manera arbitraria, salvo que de la prueba presentada se desprenda que estas carecen de fundamento para ser sostenidas. *Pueblo v. Acevedo Estrada*, supra, pág. 99; *Pueblo v. Maisonave Rodríguez*, supra, pág. 62. En otras palabras, "a menos que existan los elementos antes mencionados y/o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo *deberá abstenerse* de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos". *Pueblo v. Acevedo Estrada*, supra, pág. 99; *Pueblo v. Maisonave Rodríguez*, supra, pág. 63.

### C. Asesinato Estatutario

El Artículo 92 del Código Penal establece que el "[a]sesinato es dar muerte a un ser humano a propósito, con conocimiento o temerariamente". 33 LPRA § 5141. Este delito está dividido en varias modalidades: asesinato en primer grado, segundo grado y asesinato atenuado.

El asesinato en primer grado está tipificado en el Artículo 93 del Código Penal. 33 LPRA sec. 5142. En lo pertinente, el inciso (a) dispone que constituye asesinato en primer grado el "perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, o a propósito o con conocimiento". *Íd.* El término "a propósito" se define como: "Una persona actúa a propósito cuando el objetivo consciente de la persona es cometer el delito". 33 LPRA § 5014.

Por su parte, el Artículo 22 del Código Penal define los elementos subjetivos del delito actuado "a propósito" o "con conocimiento". 33 LPRA § 5035. Establece lo siguiente:

Elementos subjetivos del delito.

(1) A propósito

(a) con relación a un resultado, una persona actúa "a propósito" cuando su objetivo consciente es la producción de dicho resultado.

(b) con relación a una circunstancia, una persona actúa "a propósito" cuando la persona cree que la circunstancia existe.

(2) Con conocimiento

(a) con relación a un resultado, una persona actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta.

(b) con relación a un elemento de circunstancia, una persona actúa "con conocimiento" cuando está consciente de que la existencia de la circunstancia es prácticamente segura. *Íd.*

Ahora bien, el Artículo 93 del referido Código, 33 LPRA sec. 5142, esboza los distintos grados de asesinato que están tipificados en nuestro ordenamiento:

(a) Todo asesinato perpetrado por medio de veneno, acecho, tortura, estrangulamiento, sofocación o asfixie posicional, o a propósito o con conocimiento.

(b) Todo asesinato causado al perpetrarse o intentarse algún delito de incendio agravado, **agresión sexual**, robo, escalamiento agravado, secuestro, secuestro de un menor, estrago (excluyendo la modalidad negligente), envenenamiento de aguas de uso público (excluyendo la modalidad negligente), agresión grave, fuga, maltrato (excluyendo la modalidad negligente), abandono de un menor; maltrato, maltrato agravado, maltrato mediante restricción de la libertad, o agresión sexual conyugal, según contemplados en la Ley Núm. 54 de 15 de agosto de 1989, según enmendada, conocida como la "Ley para la Protección e Intervención de la Violencia Doméstica".

[...]. (énfasis suplido).

Específicamente, en el inciso B se tipifica el *asesinato estatutario*, el cual provee para que, a una persona se le pueda imputar el delito de asesinato en primer grado, si le causa la muerte a otra al cometer alguno de los delitos que están expresamente enumerados en el referido Artículo. Siendo así, para que se configure el delito de asesinato estatutario es requisito que este se cometa a propósito, con conocimiento o temerariamente, así como por consecuencia natural de alguno de los delitos base allí esbozados.

*Pueblo En Interés del Menor ESMR*, 189 DPR 787, 798 (2013). Por tanto, resulta indispensable que la realización del delito base, o al menos su tentativa, genere un riesgo considerable y típicamente relevante para producir el resultado que se imputa.

**D. Agresión Sexual**

Por otro lado, el Artículo 130 del Código Penal, 33 LPRA sec. 5191, codifica el delito de agresión sexual como sigue:

> [T]oda persona que, a propósito, con conocimiento o temerariamente lleve a cabo, o que provoque que otra persona lleve a cabo, un acto orogenital o una penetración sexual vaginal o anal ya sea ésta genital, digital, o instrumental, en cualquiera de las circunstancias que se exponen a continuación:
>
> (a) Si la víctima al momento del hecho no ha cumplido dieciséis (16) años, salvo cuando la víctima es mayor de catorce (14) años y la diferencia de edad entre la víctima y el acusado es de cuatro (4) años o menos.
>
> [...].

**E. Incesto**

El Artículo 131 del Código Penal, 33 LPRA sec. 5192, tipifica el delito de incesto como lo siguiente:

> Serán sancionadas con pena de reclusión por un término fijo de cincuenta (50) años en años naturales, aquellas personas que tengan una relación de parentesco, por ser ascendiente o descendiente, por consanguinidad, adopción o afinidad, o colateral por consanguinidad o adopción, hasta el tercer grado, o por compartir o poseer la custodia física o patria potestad y que a propósito, con conocimiento o temerariamente lleven a cabo un acto orogenital o una penetración sexual vaginal o anal, ya sea ésta genital, digital o instrumental.
>
> [...].

**F. Descubrimiento de prueba**

La Constitución de Puerto Rico, mediante las secciones 7 y 11 del Artículo II, garantiza el derecho a toda persona acusada a preparar adecuadamente su defensa. Art. II, Secs. 7 y 11, Const. PR, LPRA, Tomo I. Este derecho incluye el acceso a evidencia que pueda favorecerle mediante el mecanismo de descubrimiento de prueba. *Pueblo v. Rodríguez González,* 202 DPR 258, 269-270 (2019). Es norma reiterada que el derecho al descubrimiento de prueba es

consustancial con el derecho del acusado de defenderse en un proceso criminal. *Pueblo v. Sanders Cordero*, 199 DPR 827, 835 (2018).

No obstante, ese derecho no es uno absoluto. *Soc. Asist. Leg. v. Ciencias Forenses*, 179 DPR 849, 857 (2010). El descubrimiento de prueba en el ámbito criminal está delimitado por lo dispuesto en la Regla 95 de Procedimiento Criminal, 34 LPRA Ap. II, R. 95, la cual dispone, en lo pertinente, como sigue:

> (a) El acusado presentará moción al amparo de esta Regla dentro en un término de cumplimiento estricto de veinte (20) días contados a partir de: i) la celebración del acto de lectura de acusación en los casos que se impute la comisión de un delito grave; o ii) la primera comparecencia del acusado al proceso asistido por el abogado que habrá de representarlo en el juicio, en los casos en que se impute la comisión de un delito menos grave. En el caso que la persona acusada manifieste que se representará por derecho propio, el Tribunal deberá advertirle desde cuándo comienza a discurrir el término establecido en esta Regla, así como las consecuencias de su incumplimiento. Sometida la moción de la defensa conforme a lo dispuesto en esta Regla, el Tribunal ordenará al Ministerio Fiscal o a cualquier agencia o instrumentalidad pública que permita al acusado inspeccionar, copiar o fotocopiar el siguiente material o información que está en posesión, custodia o control del Ministerio Fiscal o a cualquier agencia o instrumentalidad pública:
>
> [...]
>
> (4) Cualquier libro, papel, documento, fotografía, objeto tangible, estructura o lugar que sea relevante para preparar adecuadamente la defensa del acusado, que el Ministerio Fiscal se propone utilizar en el juicio o que fue obtenido del acusado o perteneciera al acusado.
>
> [...].

Conforme a lo anterior, el Tribunal Supremo de Puerto Rico ha sido categórico al establecer que la obligación del Ministerio Público de descubrir prueba a la defensa se activa luego de la presentación del pliego acusatorio. En los casos sobre delitos menos graves, esto ocurre con la presentación de la denuncia; y en los casos de delitos graves, con la presentación de la acusación. *Soc. Asist. Leg. v. Ciencias Forenses*, *supra*, págs. 858-859. *Véase, además, Pueblo v. Pillot Rentas*, 169 DPR 746, 760 (2006).

En lo pertinente a la controversia que nos ocupa, la Regla 52 de Procedimiento Criminal, 34 LPRA Ap. II, R. 52, establece que, previo a que la persona acusada de delito haga la alegación correspondiente, se le tiene que entregar copia de la acusación con una lista de los testigos que se utilizarán en su contra. Su propósito consiste en permitir que el acusado pueda prepararse adecuadamente para el juicio en su contra. *Pueblo v. Ramos Álvarez*, 118 DPR 782, 789 (1987). No obstante, el tribunal tiene discreción para permitir la inclusión de testigos no anunciados en el juicio. *Pueblo v. Rodríguez González*, supra, pág. 277; *Pueblo v. Ramos Álvarez*, supra, pág. 789. Incluso, en casos que se ventilan ante un jurado, nuestro Máximo Foro ha expresado que la presentación de testigos que no se anunciaron en el pliego acusatorio no acarrea necesariamente la disolución del jurado, siempre que el Tribunal entienda que no se ha menoscabado el derecho del acusado a un juicio justo e imparcial. *Pueblo v. Rivera Santiago*, 176 DPR 559, 589 (2009).

Si la defensa hace una alegación de sorpresa, perjuicio o que requiere de un plazo razonable para prepararse, el Foro Primario deberá otorgarle el tiempo necesario para garantizar el ejercicio su derecho. *Pueblo v. Ramos Álvarez*, supra, pág. 789.

**G. Autenticación**

La Regla 901 de las de Evidencia, 32 LPRA Ap. VI, R. 901, dispone lo siguiente:

> (a) El requisito de autenticación o identificación como una condición previa a la admisibilidad se satisface con la presentación de evidencia suficiente para sostener una determinación de que la materia en cuestión es lo que la persona proponente sostiene.
>
> (b) De conformidad con los requisitos del inciso (a) de esta regla y sin que se interprete como una limitación, son ejemplos de autenticación o identificación los siguientes:
>
> [...]
>
> > (11) Cadena de custodia – La evidencia demostrativa real puede ser autenticada mediante su cadena de custodia.

Por "evidencia demostrativa" se entiende que es aquella perceptible por los sentidos y que le transmite al juzgador de los hechos una impresión de primera mano. E.L. Chiesa Aponte, *Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales*, República Dominicana, Ed. Corripio, 1998, T. II, págs. 1049-1056. La evidencia demostrativa puede ser real o ilustrativa. La evidencia real es aquella que "juega un papel central y directo en el asunto que sea objeto de la controversia". *Pueblo v. Nazario Hernández*, 138 DPR 760, 774 (1995).

Por otra parte, el único propósito de la evidencia ilustrativa es "enseñar, instruir, representar o hacer más comprensible un testimonio u otra evidencia". *Íd*. A esos fines, para autenticar la misma se requiere lo siguiente:

> [L]o único que el proponente debe establecer es que tal evidencia es de ayuda al juzgador para entender otra evidencia, particularmente el testimonio de un testigo. En estos casos, el origen de la evidencia ilustrativa tiene poca o ninguna importancia. [...] Lo único importante es que el tribunal entienda que la evidencia ilustrativa hace más comprensible la otra evidencia.

*Íd.*, pág. 775, citando a E.L. Chiesa, *Práctica Procesal Puertorriqueña: Evidencia*, San Juan, Pubs. J.T.S., 1983, Vol. I, pág. 514.

Ahora bien, cuando el juzgador de los hechos es un jurado, el proponente de la evidencia en controversia no tiene que excluir toda probabilidad de alteración de dicha prueba, puesto que si el tribunal está convencido de que no ha habido anormalidad que afecte la cadena de custodia de esta, se admitirá y le corresponderá al jurado evaluarla a la luz de las circunstancias que la rodean. *Pueblo v. Bianchi Álvarez*, 117 DPR 484, 492 (1986). Por tanto, de demostrar no hay una probabilidad razonable de que la prueba haya sufrido un cambio, "cualquier duda que surja respecto a la posible adulteración o contaminación de la evidencia se dirige al peso y no

a la admisibilidad de la prueba". *Íd.* En lo pertinente, el profesor Chiesa explicó lo siguiente:

> El tribunal recibe evidencia del proponente para establecer la autenticidad de la evidencia y el juez debe admitirla y pasarla al jurado con tan solo creer que un jurado razonable podría estimar que la cosa es lo que el proponente sostiene que es, aunque el juez personalmente crea otra cosa. Más aun, el juez instruirá al jurado de que el corresponde a ellos determina en última instancia si la evidencia es auténtica. Todo esto está centrado en que de otra manera se lesiona el alcance del juicio por jurado.

E. L. Chiesa Aponte, *Reglas de Evidencia Comentadas,* San Juan, Situm, 2016, pág. 346.

Ahora bien, la Regla 403 de las de Evidencia, 32 LPRA Ap. VI, R. 403, establece que hay ciertas instancias en las que la evidencia pertinente puede ser excluida:

> Evidencia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualesquiera de estos factores:
>
> > (a) Riesgo de causar perjuicio indebido.
> > (b) Riesgo de causar confusión.
> > (c) Riesgo de causar desorientación del jurado.
> > (d) Dilación indebida de los procedimientos.
> > (e) Innecesaria presentación de prueba acumulativa.

No obstante, y en lo pertinente a la controversia que nos ocupa, nuestro Tribunal Supremo ha expresado que "[e]l mero de hecho de que una fotografía pueda impresionar al jurado desfavorablemente para el acusado no justifica su exclusión. Ello es así porque el jurado debe conocer todo lo relacionado con el caso que juzga para estar en mejores condiciones de rendir un veredicto justo". *Pueblo v. Ortiz Rodríguez,* 103 DPR 368, 372 (1975) (citas omitidas).

En lo referente a la función revisora de esta Curia, el Tribunal Supremo de Estados Unidos estableció que quien está en mejor posición de entender sobre el balance entre el valor probatorio y el efecto perjudicial indebido es el Tribunal de Primera Instancia. Chiesa Aponte, *Reglas de Evidencia Comentadas, op. cit.,* pág. 79, citando a *Sprint v. Mendelsohn,* 552 US 379 (2008). Por tanto, "[l]as cortes apelativas deben sostener las determinaciones del [T]ribunal

de [P]rimera [I]nstancia al amparo de la [R]egla 403, salvo abuso de discreción. Chiesa Aponte, *Reglas de Evidencia Comentadas, op. cit.,* pág. 79.

## H. Confesión del Acusado

Sabido es que, tanto de la Quinta Enmienda de la Constitución de Estados Unidos, como del Artículo II, Sección 11, de la Constitución de Puerto Rico, emana el derecho contra la autoincriminación de todo ciudadano. En específico, nuestra Carta Magna dispone que "[n]adie será obligado a incriminarse mediante su propio testimonio y el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra". Art. II, Sec. 11, Const. ELA, LPRA, Tomo 1. Para hacer valer este derecho, el Tribunal Supremo de Puerto Rico ha adoptado la norma establecida por la Corte Suprema de Estados Unidos en *Miranda v. Arizona,* 384 US 436 (1966), a los fines de exigir que, previo a interrogar a una persona sospechosa de haber cometido un delito, el Estado tiene que advertirle de los derechos que le asisten por virtud de las referidas disposiciones constitucionales:

> En específico, las llamadas "advertencias de Miranda" comprenden lo siguiente, aunque las mismas no tienen que seguir un lenguaje exacto: que la persona tiene que ser advertida de su derecho a guardar silencio; que cualquier declaración que haga podrá y será usada como evidencia en su contra; y que tiene derecho a ser asistido por un abogado ya sea que la persona lo contrate o, de carecer de recursos económicos, asignado por el Estado.

*Pueblo v. Millán Pacheco*, 182 DPR 595, 610 (2011).

A pesar de que los ciudadanos ostentan dichos derechos, se ha reconocido que se estos son renunciables. *Pueblo v. Millán Pacheco,* supra, pág. 610. Siendo así, ante el escenario de que se pretenda presentar en el juicio una confesión hecha por el acusado, recae sobre el Estado la responsabilidad de presentar prueba detallada que demuestre que se le impartieron las debidas advertencias al sospechoso, así como de las condiciones imperantes al momento en que se hizo la renuncia y que esta se hizo de manera

inteligente y voluntaria. *Pueblo v. Ruiz Bosch*, 127 DPR 762, 776 (1991).

Ahora bien, "[l]a determinación de si una confesión (o admisión) del acusado es o no admisible en el juicio es hecha por el juez, sin participación alguna del jurado. [...] El jurado no debe enterarse de que hubo una confesión hasta que ésta haya sido debidamente admitida por el tribunal". Ernesto L. Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa*, Situm, 2017, pág. 109. Por tanto, previo a que se admita como prueba de cargo una confesión del acusado, el tribunal evaluará si, bajo la totalidad de las circunstancias en que se obtuvo esta, hubo alguna violación al debido proceso de ley. Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa, op. cit.,* págs. 48-49. Conforme a lo anterior, la Regla 151.1 de las de Procedimiento Criminal, 34 LPRA Ap. II, R. 151.1, reza:

> En los juicios por jurado, todas las cuestiones de hecho y de derecho referentes a una confesión del acusado serán oídas y resueltas exclusivamente por el juez, en ausencia del jurado, debiendo el juez admitir en evidencia o rechazar dicha confesión. Esta disposición no tendrá el efecto de impedir que el acusado presente al jurado, y que la parte contraria la refute, evidencia pertinente relativa al peso o credibilidad de la confesión, y a las circunstancias bajo las cuales la confesión fue obtenida.

De igual forma, la Regla 109 (c) de las de Evidencia, 32 LPRA Ap. VI, R. 109, dispone lo siguiente:

> En casos ventilados ante jurado, toda la evidencia relativa a la admisibilidad de una confesión de la persona acusada será escuchada y evaluada por la jueza o el juez en ausencia del jurado. Si la jueza o el juez determina que la confesión es admisible, la persona acusada podrá presentar al jurado, y el Ministerio Público podrá refutar, evidencia pertinente relativa al peso o credibilidad de la confesión y a las circunstancias bajo las cuales la confesión fue obtenida. [...].

Por consiguiente, por tratarse de una cuestión estrictamente de derecho, recae sobre el tribunal la responsabilidad de determinar si la confesión de un acusado es admisible. *Pueblo v. Hernández González*, 175 DPR 274, 298 (2009), citando a *Pueblo v. Martínez Torres*, 126 DPR 561, 575 (1990). Para ello, la Regla 234 de las de

Procedimiento Criminal, 34 LPRA Ap. II, R. 234, provee para la celebración de una vista de supresión de evidencia. La determinación de admisibilidad de la evidencia en controversia se regirá por los principios establecidos en la Regla 109 de las de Evidencia, *supra.* Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa, op. cit.*, pág. 290. A pesar de que la defensa tiene una primera oportunidad de impugnar la admisibilidad de dicha confesión previo a que se le presente al jurado, ello no impide que durante el juicio, este presente prueba para rebatir el peso de la prueba, puesto que "el jurado siempre puede evaluar el valor probatorio de la confesión o admisión". Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa, op. cit.*, pág. 111.

De igual forma, en el juicio, la defensa puede reproducir nuevamente la solicitud de supresión de evidencia, pero únicamente si de la prueba de cargo surge la ilegalidad de esta. Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa, op. cit.,* pág. 294. "Nuevos hechos, nueva luz sobre credibilidad de los testigos de cargo u otras materias que surjan en el juicio pueden arrojar dudas sobre la resolución anterior". *Pueblo v. Hernández Flores*, 113 DPR 511, 516 (1982), citando a *Rouse v. Unites States*, 359 F. 2d. 1014, 1015-1016 (D.C. Cir. 1966). De este modo, será responsabilidad de la defensa poner en posición al Tribunal de considerar las circunstancias específicas que ameritan la reproducción de dicha solicitud de supresión de evidencia. *Íd.*

Ahora bien, nuestro ordenamiento jurídico ha reconocido que "una convicción no puede sostenerse únicamente a base de la confesión extrajudicial no corroborada del acusado; se requiere alguna otra evidencia que tienda a corroborar la confesión". Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa, op. cit.,* pág. 116. A tales efectos, nuestro Tribunal Supremo estableció que es necesario que "la confesión de un acusado sea corroborada con

prueba *aliunde* que tienda a establecer el corpus delicti". *Pueblo v. Fradera Olmo*, 122 DPR 67, 73 (1988). Este tipo de prueba se ha definido como "aquella que demuestre que se ha sufrido una pérdida o daño específico y que dicho daño o pérdida específica fue ocasionada por un agente criminal". *Pueblo v. Hernández Mercado*, 126 DPR 427, 445 (1990), citando a *Pueblo v. Hernández*, 75 DPR 907, 915 (1954); *Pueblo v. Fradera Olmo*, supra, pág. 73. Por tanto, será suficiente "si la evidencia de corroboración tiende a sostener los elementos esenciales admitidos por el acusado en forma tal que justifique la determinación de su veracidad por un jurado". *Pueblo v. Fradera Olmo*, supra, pág. 74, citando a *Pueblo v. Campos Suárez*, 86 DPR 310, 311 (1968). Es decir que no es necesario que la evidencia de corroboración establezca la culpabilidad del acusado más allá de duda razonable, sino que la prueba circunstancial podría ser suficiente para ratificar la admisión o confesión en controversia, si al ser evaluada en conjunto tiende a establecer el corpus delicti. *Pueblo v. Fradera Olmo*, supra, pág. 74.

**-III-**

En su *primer y segundo señalamiento de error*, el apelante alegó que el Tribunal de Primera Instancia incidió al admitir como evidencia un video, así como al permitir la inclusión de la fotoperiodista como testigo, ya que sostuvo que dicha prueba no se anunció por el Ministerio Público en el descubrimiento de prueba. Por lo cual, argumentó que actuó erróneamente el Foro Primario al permitir su inclusión ya comenzado el juicio. Por el contrario, el Procurador adujo que había anunciado que presentaría como testigo a la persona que tomó el referido video para propósitos de su autenticación. No obstante, explicó que tuvo dificultad para advenir en conocimiento de su identidad, ya que esta había renunciado al canal de televisión. Asimismo, arguyó que la defensa tenía conocimiento del aludido video, debido a que el mismo fue publicado

tanto en televisión como en las redes sociales. En adición, explicó que se le hizo la invitación a la defensa para que buscara cierta prueba y documentación, entre ellas, el video en controversia.

Tal cual esbozado en el resumen doctrinal, a pesar de que el Ministerio Público tiene el deber de anunciar la prueba que será presentada con anterioridad al juicio, nuestro ordenamiento jurídico le confiere discreción al Tribunal de Primera Instancia permitir la inclusión de testigos posterior al comienzo de los procedimientos. El Foro Primario tendrá que asegurarse que el derecho de la persona acusada de delito a un juicio justo e imparcial no se vea lacerado con dicha acción. De igual forma, el Tribunal podrá concederle un tiempo razonable a la defensa en vías de que esta pueda prepararse adecuadamente.

En el caso ante nos, surge de los autos que, el 8 de abril de 2024, posterior al comienzo del juicio, el Ministerio Público le informó a la defensa la identidad de la fotoperiodista que tomó el referido video. Tras escuchar los planteamientos de ambas partes, el Foro apelado permitió la inclusión de la testigo, y le concedió un término a la defensa para que esta pudiese prepararse. Por tanto, es nuestra apreciación que el Foro Primario actuó dentro de la discreción que le otorga nuestro ordenamiento jurídico al permitir que se incluyera la testigo.

De igual forma, surge del presente caso que, a pesar de reconocer que el contenido del video no fue detallado en las mociones relacionadas con el descubrimiento de prueba, emana de estas que se le hizo una invitación a la defensa para que esta buscara cierta prueba, entre ellas el video en cuestión. Aun así, el Foro Primario le indicó a la defensa que le daría un tiempo para poder prepararse adecuadamente. Por tanto, concluimos que el Tribunal de Primera Instancia no abusó de su discreción al proceder de tal manera. Tampoco consideramos que los derechos

constitucionales del apelante se hayan visto lacerados por dicha determinación.

Por otra parte, en su *tercer señalamiento de error*, el apelante alegó que el Foro de Instancia erró al admitir en evidencia dicho video, ya que sostuvo que este no fue debidamente autenticado por el Ministerio Público. Además, planteó que el video tuvo el efecto de causar un perjuicio indebido o confusión en el juzgador de los hechos, ya que aseveró que este apeló a los sentimientos y emociones del Jurado de manera perjudicial. Por otro lado, el Ministerio Público arguyó que el video constituyó evidencia ilustrativa sobre lo que declaró el agente Meléndez Álvarez, por lo que este quedó autenticado al presentar a la persona que lo grabó.

Conforme al derecho aplicable, la evidencia demostrativa podrá ser autenticada por su cadena de custodia. Particularmente, cuando se trata de evidencia ilustrativa, esta no requiere una autenticación tan rigurosa, puesto que su propósito es ayudar al juzgador de los hechos a entender un testimonio. Igualmente, se ha establecido que, a pesar de que toda controversia relativa a la admisibilidad de una prueba deberá ser dilucidada en ausencia del jurado por tratarse de una cuestión estrictamente de derecho, si el tribunal entiende que no ha habido una anormalidad que afecte la cadena de custodia, este podrá admitir la prueba. De este modo, cualquier duda que surja sobre su adulteración estriba en el peso de dicha evidencia y no su admisibilidad, por lo que le corresponderá al jurado otorgarle el valor probatorio que entienda pertinente.

En el presente caso, es nuestra apreciación que el video en controversia tuvo el propósito de ilustrarle al juzgador lo narrado por el agente Meléndez Álvarez, por lo que este constituyó evidencia ilustrativa. En específico, el agente Meléndez Álvarez declaró que, luego de haberle encontrado causa probable para arresto al señor Ortiz Soto, escoltó al apelante al vehículo. En el transcurso y a

preguntas de la prensa, indicó que el señor Ortiz Soto expresó "[ATOQ] perdóname, perdóname por lo que hice, [ATOQ] perdóname",[7] así como "que la salud mental del país estaba mal".[8] En efecto, el video que se le mostró al Jurado reflejó el momento en que se hicieron dichas manifestaciones. Por lo tanto, coincidimos con el Tribunal de Primera Instancia en que el referido video quedó debidamente autenticado cuando la fotoperiodista declaró que fue la responsable de grabar el mismo. En lo pertinente, esta testificó que, el 9 de junio de 2023, grabó "la salida del caballero hasta que se monta en el vehículo y se va, y se lo llevan".[9] Asimismo, al mostrarle el referido video en sala, la fotoperiodista reconoció que este era el mismo que ella grabó.[10] Siendo así, cualquier duda respecto a su posible alteración estaba dirigida al peso de la prueba, y, conforme al derecho aplicable, le correspondía al Jurado dirimir su credibilidad. Por tal razón, en ausencia de abuso de discreción o error manifiesto, procede darle deferencia a la determinación del juzgador de los hechos.

Además, colegimos que el video no tuvo el efecto de causarle un perjuicio indebido ni confusión al Jurado. Conforme al derecho antes esbozado, el hecho de que un video pudiese impresionar al Jurado no acarrea su exclusión. Por tanto, concluimos que el Foro Primario no abusó de su discreción al admitirlo. Además, somos del criterio que el apelante no nos persuadió para determinar que dicha prueba laceró su derecho a un juicio justo e imparcial. Por lo cual, concluimos que tampoco se cometió el tercer señalamiento de error.

Ahora bien, en su *cuarto y quinto señalamiento de error*, el apelante adujo que el Tribunal de Primera Instancia erró al no celebrar una vista al amparo de la Regla 109 de las de Evidencia,

---

[7] Transcripción de la prueba oral, pág. 214, líneas 25-26.
[8] *Íd.*, pág. 215, línea 6.
[9] *Íd.*, pág. 221, líneas 21-22.
[10] *Íd.*, pág. 225, líneas 26-27.

*supra*, previo a que el agente Meléndez Álvarez declarara sobre la confesión del señor Ortiz Soto. Sostuvo que esta se obtuvo en violación a su derecho contra la autoincriminación. En contraste, el Ministerio Público arguyó que lo relativo a la admisibilidad de la confesión se atendió en la vista de supresión de evidencia que se celebró el 31 de octubre de 2023, por lo que una vista al amparo de la Regla 109 de las de Evidencia, *supra*, era innecesaria. Además, sostuvo que se probó que el acusado renunció a su derecho contra la autoincriminación de manera voluntaria, consciente e inteligente.

En primer lugar, tal cual mencionamos anteriormente, la defensa tiene derecho a reproducir nuevamente una petición de supresión de evidencia durante el juicio, independientemente de que se haya celebrado una vista de supresión previo al comienzo de los procedimientos. No obstante, para que ello proceda, debe surgir de la prueba en el juicio su ilegalidad. Del mismo modo, su planteamiento debe sostenerse en hechos o prueba distinta a la que se evaluó anteriormente. *Pueblo v. Hernández Flores*, supra. Por tanto, en ausencia de prueba nueva que amerite considerar nuevamente su admisibilidad, no procederá su revisión.

En el caso ante nos, surge claramente de los autos que el 31 de octubre de 2023 se celebró una vista de supresión sobre la confesión en controversia. Esta fue denegada, mediante *Resolución,* el 6 de noviembre de 2023. Inconforme, la defensa reprodujo su petición durante el juicio, oponiéndose a que se presentara la confesión hecha por el apelante ante el Jurado. Específicamente, surge de la *Minuta* de la vista celebrada el 23 de septiembre de 2024, que el Tribunal de Primera Instancia le preguntó a la defensa si había algún asunto nuevo que no se hubiese atendido en la vista del 31 de octubre de 2023. No obstante, la defensa se limitó a decir que tenía derecho a objetar la referida prueba.

Siendo así, y tras evaluar la transcripción de los procedimientos, así como los autos del presente caso, no observamos que, durante el juicio, haya surgido nueva evidencia o que la prueba desfilada justificara la celebración de una vista al amparado de la Regla 109 de las de Evidencia, *supra.* Por tal razón, concluimos que el Foro de Instancia no abusó de su discreción al denegar la petición de la defensa.

Ahora bien, en cuanto a la renuncia del apelante a su derecho contra la autoincriminación, surge tanto de la prueba documental como de la transcripción de los procedimientos que la misma fue hecha de manera voluntaria, consciente e inteligente. En específico, emana del presente caso que el agente Meléndez Álvarez le preguntó al señor Ortiz Soto si entendía cada una de las advertencias legales que le leyó, previo a comenzar el interrogatorio.[11] Asimismo, surge que el apelante hizo constar su entendimiento al iniciar cada una de las seis (6) advertencias realizadas, así como al firmar el documento correspondiente.

De igual forma, al evaluar el expediente en autos no se desprende que hayan mediado circunstancias durante el interrogatorio que tuviesen el efecto de lacerar el derecho del apelante contra la autoincriminación. De la prueba creída por el Jurado, surge que el señor Ortiz Soto se encontraba tranquilo, sereno, así como que se le ofreció refresco, café y comida.[12] Tampoco surge que el apelante estuviese esposado mientras se le interrogó.[13] Además, surge que, previo a comenzar sus preguntas, el agente Meléndez Álvarez le advirtió que se le estaría interrogando por los hechos delictivos relacionados a la menor ATOQ.[14] Por tanto, coincidimos con el Tribunal de Primera Instancia al determinar que

---

[11] *Íd.*, págs. 195-202.
[12] *Íd.*, págs. 203.
[13] *Íd.*, pág. 194, líneas 13-14.
[14] *Íd.*, pág. 195, líneas 3-7.

el apelante renunció de manera voluntaria, consciente e inteligente a su derecho a la no autoincriminación.

En su *sexto señalamiento de error*, el apelante cuestiona que el Jurado lo haya encontrado *culpable*, más allá de duda razonable, de un (1) cargo por el delito de asesinato en primer grado, en su modalidad de asesinato estatutario, cuatro (4) cargos por el delito de agresión sexual, y cuatro (4) cargos por el delito de incesto. En esencia, el apelante arguyó que no se probó que el apelante hubiese actuado a propósito o con conocimiento para cometer el asesinato imputado. Por el contrario, el Ministerio Público sostiene que la prueba desfilada demostró que el señor Ortiz Soto actuó a propósito y con conocimiento al agredir sexualmente a su hija, la menor ATOQ, y causarle la muerte. Arguyó que la prueba presentada, y creída por el Jurado, corroboró los hechos confesados por el apelante.

Para atender adecuadamente este señalamiento de error procedemos a resumir los hechos según la prueba presentada durante el juicio.

En la noche del 6 de junio de 2023, aproximadamente entre 10:00pm a 11:00pm,[15] el señor Ortiz Soto y la Sra. Naiari Quiñones Rivera (en adelante, "señora Quiñones Rivera"), llegaron a su domicilio en el Residencial Bahía, en Guayanilla, junto con sus dos (2) hijas menores de edad: la mayor de cuatro (4) años de edad, nombrada por sus siglas como JSOQ (en adelante, "JSOQ"), y la menor ATOQ.[16] Allí, el señor Ortiz Soto se encargó de acostar a dormir a las menores, en sus respectivas habitaciones.[17]

Según la señora Quiñones Rivera, luego de acostar a las menores, fumó con el apelante marihuana en el balcón.[18]

---

[15] *Íd.*, pág. 205, líneas 1-14.
[16] *Íd.*, pág. 31 y 39.
[17] *Íd.*, pág. 39, líneas 17-18.
[18] *Íd.*, pág. 39, línea 28-29.

Posteriormente, ambos se fueron a dormir en la misma habitación.[19] Durante la noche, la señora Quiñones Rivera se despertó para atender a la menor JSOQ.[20] En dicha interacción, la menor JSOQ le expresó "*monster* en [la menor ATOQ]", a lo cual la señora Quiñones Rivera le respondió que los *monsters* se habían ido a dormir.[21] Luego la señora Quiñones Rivera regresó a su cama con el señor Ortiz Soto.[22]

Posteriormente, la señora Quiñones Rivera se despertó nuevamente, y observó que el señor Ortiz Soto no estaba en la cama.[23] Al buscarlo, lo encontró en el baño, limpiándose el pene.[24] Al cuestionarle qué hacía, este le respondió que estaba en el baño y que quería tener relaciones sexuales con ella.[25] Por lo cual, ambos regresaron al cuarto. Sin embargo, la señora Quiñones Rivera escuchó un gemido de la menor ATOQ, que describió que parecía como si esta se fuese a despertar.[26]

La señora Quiñones Rivera describió que el señor Ortiz Soto salió primero para ir a verificarla, y en el ínterin, esta observó un "revolú" de la puerta abrir y cerrarse, para luego encontrarse al apelante de frente.[27] En ese entonces, el señor Ortiz Soto le expresó que vio a una persona salir de la casa, pero que no se preocupara y que regresara al cuarto.[28] Luego, la señora Quiñones Rivera observó que el apelante arropó a la menor ATOQ, quien se encontraba acostada en su cuna, en dirección hacia la pared.[29] La señora Quiñones Rivera señaló que, al prender la luz del cuarto, la menor

---

[19] *Íd.*, pág. 40, líneas 14-15.
[20] *Íd.*, pág. 40, líneas 15-16 y líneas 28-29.
[21] *Íd.*, pág. 40, línea 30, y pág.41, líneas 1-2.
[22] *Íd.*, pág. 41, líneas 16-18.
[23] *Íd.*
[24] *Íd.*, pág. 42, líneas 2-5.
[25] *Íd.*, pág. 42, líneas 10-14.
[26] *Íd.*, pág. 42, líneas 19-22.
[27] *Íd.*, pág. 42, líneas 28-29; y pág. 43, líneas 1-3.
[28] *Íd.*, pág. 43, líneas 19-22.
[29] *Íd.*, pág. 44, líneas 28-29, y pág. 45, líneas 1-2.

hizo un gesto como si le molestara la claridad, por lo que la volvió a apagarla y regresó a su habitación con el señor Ortiz Soto.[30]

Al día siguiente, el 7 de junio de 2023, la señora Quiñones Rivera al levantarse, verificó a la menor ATOQ, pero esta seguía dormida en la misma posición de la noche anterior.[31] Por lo cual, la señora Quiñones Rivera procedió a llevar a la menor JSOQ a casa de su madre, quien vivía en otro edificio del mismo residencial.[32] A su regreso, vio al apelante, quien le preguntó sobre la menor ATOQ.[33] Tras indicarle que la había dejado durmiendo, el señor Ortiz Soto entró nuevamente a la residencia para verificarla.[34] Luego salió con la menor ATOQ en sus brazos, preguntando qué le había pasado.[35] La señora Quiñones Rivera describió que la menor ATOQ tenía la coronilla de la cabeza violeta, azul, y rosa, así como que alrededor de la boca tenía amarillo y marrón.[36] Por tal razón, tanto el apelante como la señora Quiñones Rivera, llevaron a la menor ATOQ a la sala de emergencias, ubicada en el CDT en Guayanilla.[37] Al llegar allí, el Dr. James Torres Piña (en adelante, "doctor Torres Piña") le preguntó a la señora Quiñones Rivera qué le había sucedido, pero esta no le supo decir.[38]

Surge del testimonio del doctor Torres Piña que este observó que la menor ATOQ tenía hematomas en la cabeza y en los brazos, así como laceraciones en el abdomen y las piernas.[39] Más adelante, el doctor Torres Piña se retiró para llamar a distintos hospitales que pudiesen atender las heridas de la menor ATOQ.[40] En el transcurso, se le acercó una enfermera llorando, informándole que cuando le fue

---

[30] *Íd.*, pág. 45, líneas 1-11.
[31] *Íd.*, pág. 46, líneas 10-15.
[32] *Íd.*, pág. 47, líneas 1-2.
[33] *Íd.*, pág. 47, líneas 19-26.
[34] *Íd.*, pág. 47, líneas 28-30, y pág. 48, línea 1.
[35] *Íd.*, pág. 48, líneas 1-5.
[36] *Íd.*, pág. 48, líneas 5-6.
[37] *Íd.*, pág. 48, líneas 12-13.
[38] *Íd.*, pág. 48, líneas 26-27; y pág. 141, líneas 27-29.
[39] *Íd.*, pág. 141, líneas 7-19.
[40] *Íd.*, pág. 142, líneas 1-15.

a poner el supositorio a la menor ATOQ esta no respondía, ni podía tragar, al igual que, "cuando le fue a abrir el pamper[,] de su ano salió un líquido blanco".[41] Posteriormente, el doctor Torres Piña examinó los genitales de la menor ATOQ y observó que, en el pamper y algunas partes íntimas de esta, había sangre.[42] Además, el doctor Torres Piña describió que el pañal de la menor ATOQ estaba "completamente lleno de orines",[43] y que el ano de esta no mostraba resistencia ni tono.[44]

Tras intervenir con la menor ATOQ, el doctor Torres Piña decidió transportarla al Hospital San Lucas, en Ponce.[45] No obstante, debido a que el doctor Torres Piña tenía sospechas sobre lo que había ocurrido, este no permitió que la señora Quiñones Rivera los acompañara en la ambulancia.[46] Respecto al apelante, el doctor Torres Piña explicó que solamente tuvo contacto visual con el señor Ortiz Soto, y que este "nunca dijo nada, simplemente observaba todo".[47] Posteriormente, en el referido Hospital, a la 1:20pm, la menor ATOQ falleció.[48]

Tras recibir una llamada notificando del fallecimiento de una menor, el agente Francisco J. Meléndez Álvarez (en adelante, "agente Meléndez Álvarez") acudió al Hospital San Lucas.[49] Allí, observó a la menor ATOQ, y expresó que "todo su cuerpecito estaba lleno de moretones".[50] Luego, el agente Meléndez Álvarez acudió al Residencial Bahía, en donde la señora Quiñones Rivera consintió a un registro de su residencia.[51] Posteriormente, regresó a la comandancia de Ponce y entrevistó a la señora Quiñones Rivera, a

---

[41] *Íd.*, pág. 142; líneas 16-22.
[42] *Íd.*, pág. 142, líneas 29-30, y pág. 143, línea 1.
[43] *Íd.*, pág. 144; línea 17.
[44] *Íd.*, pág. 144; línea 21.
[45] *Íd.*, pág. 143, línea 3.
[46] *Íd.*, pág. 143, líneas 4-8.
[47] *Íd.*, pág. 144; línea 10-11.
[48] *Íd.*, pág. 54, líneas 18-19.
[49] *Íd.*, pág. 184, líneas 29-30, y pág. 185, líneas 1-2.
[50] *Íd.*, pág. 186, líneas 23-27.
[51] *Íd.*, pág. 187, líneas 7-28.

quien se le leyeron las advertencias Miranda, pero esta se limitó "a decir que no sabía nada del incidente".[52]

Posteriormente, el agente Meléndez Álvarez entrevistó al señor Ortiz Soto, a quien le hizo las advertencias Miranda, antes de comenzar su interrogatorio. Conforme a lo antes mencionado, el agente Meléndez Álvarez detalló que el señor Ortiz Soto expresó que entendía cada una de las advertencias que se le leyó, así como que inició cada una en el margen izquierdo y firmó el documento.[53] A preguntas del referido agente, el señor Ortiz Soto le contó que el 6 de junio de 2023, la señora Quiñones Rivera y sus dos (2) hijas habían estado de pasadía en el río Sierra Baja y que llegaron a la residencia entre 10:00pm a 11:00pm.[54] Al llegar a su residencia, él se encargó de acostar a ambas menores en sus respectivos cuartos, y luego tuvo una discusión con la señora Quiñones Rivera porque este seguía bebiendo.[55] Posteriormente, se fue a acostar, y, aproximadamente a las 2:00am, se levantó y camino al cuarto de la menor ATOQ, quien se encontraba durmiendo en su cuna.[56] Él la agarró y esta comenzó a llorar, por lo que expresó que comenzó a darle golpes para que hiciera silencio.[57] Le indicó que el golpe más duro fue en la frente, y que, luego de ese, la menor ATOQ se calló.[58] Luego, el agente Meléndez Álvarez describió que el señor Ortiz Soto le confesó lo siguiente:

> [L]e quitó el pamper[,] se la puso en la falda y ha [sic] palabras que dice el caballero, la palabra que dice el caballero dice se lo metí. Yo le pregunto en la entrevista ¿cómo se lo metiste? ¿la penetraste? Y este me dice que s[í], que la penetr[ó]. Yo le pregunto [¿]con el pene[?] y dice que sí, yo le pregunto [¿]pero d[ó]nde[?] y me dice por el frente y por atrás, yo le volví y le hago otra pregunta, ¿vaginal y anal? Y el caballero me dice que sí. […]
>
> […]

---

[52] *Íd.*, pág. 192; líneas 17-18.
[53] *Íd.*, págs. 195-203.
[54] *Íd.*, pág. 205, líneas 1-14.
[55] *Íd.*, pág. 205, líneas 15-21.
[56] *Íd.*, pág. 205.
[57] *Íd.*, pág. 206.
[58] Íd., pág. 206.

> Yo le pregunto que si eso había ocurrido antes o si le había dado en otras ocasiones y él me dice que no y que si eso había ocurrido antes y él me dice en los últimos 7 meses, 7 veces con esta.[59]

El agente Meléndez Álvarez continuó declarando que el apelante le expresó haberla agredido en diciembre de 2022, y que la señora Quiñones Rivera no tenía conocimiento de ello.[60] El señor Ortiz Soto le dijo que, tras culminar los hechos delictivos, no la verificó, sino que le puso el pamper nuevamente, la acostó en su cuna y se fue a dormir con la señora Quiñones Rivera.[61] No fue hasta el día siguiente en que el señor Ortiz Soto fue a revisar a la menor ATOQ.[62] Ahí se percata que la cuna tenía sangre y que la menor ATOQ no respondía, por lo que él y la señora Quiñones Rivera acudieron al CDT en Guayanilla.[63]

El agente Meléndez Álvarez explicó que el señor Ortiz Soto le expresó que estaba arrepentido de lo que había hecho,[64] y que lo hizo porque "tenía un sentimiento de coraje, porque el[sic] en un pasado[,]a él lo violaron[,] lo sodomizaron, cuando pequeño".[65] Asimismo, el agente Meléndez Álvarez declaró que, la confesión del apelante era compatible con lo que observó en el Hospital San Lucas.[66]

Ahora bien, como explicamos anteriormente, luego de que se determinara causa probable para arresto, el agente Meléndez Álvarez escoltó al señor Ortiz Soto.[67] En el camino se les acercaron miembros de la prensa, y a preguntas de estos, escuchó cómo el señor Ortiz Soto expresó lo siguiente: "[ATOQ] perdóname, perdóname por lo que hice, [ATOQ] perdóname".[68] Igualmente,

---

[59] *Íd.*, pág. 206; líneas 16-27.
[60] *Íd.*, pág. 206, líneas 29-30, y pág. 207 1-3.
[61] *Íd.*, pág. 207, líneas 20-22.
[62] *Íd.*, pág. 207, línea 27.
[63] *Íd.*, págs. 207, líneas 28-30, pág.208, líneas 1-2.
[64] *Íd.*, pág. 208, línea 3.
[65] *Íd.*, pág. 208; líneas 6-8.
[66] *Íd.*, pág. 209, líneas 9-12.
[67] *Íd.*, pág. 214, líneas 1-3.
[68] *Íd.*, pág. 214; líneas 25-26.

escuchó que el señor Ortiz Soto, antes de montarse al vehículo, dijo "que la salud mental del país estaba mal".[69]

Por otra parte, de la prueba forense presentada, surge que el cuerpo de la menor ATOQ mostraba señales de haber sido agredida sexualmente. En específico, la patóloga forense del ICF, la Dra. Rosa M. Rodríguez Castillo (en adelante, "doctora Rodríguez Castillo" o "patóloga") declaró que esta tenía lesiones traumáticas en la cabeza, en la nariz, en los dedos de las manos, en el antebrazo, en el tórax.[70] Asimismo, describió que tenía una contusión en el área abdominal superior izquierda, en la rodilla derecha, y dos (2) contusiones en el pie derecho.[71]

La patóloga describió que, en la evaluación interna del cuerpo, se encontró un edema cerebral, y un hematoma subdural bilateral con formación de membrana temprana.[72] Declaró que el cuerpo de la menor ATOQ presentaba lo siguiente:

> En este caso en particular[,] la totalidad de los traumas recibidos propinados[,] el daño a nivel de cabeza[,] cerebro, dura madre, cordón espinal y bazo[,] son compatibles con golpes propinados[,] un trauma propinado, trauma de abuso de niños, que **en el contexto forense por tener otros componentes viejos se llama síndrome del niño maltratado**.[73] (Énfasis nuestro).

También describió que, en el área de los genitales, tenía lesiones de contusiones recientes, así como lo siguiente:

> "En este caso particular[,] tenía unas contusiones en la parte, según las manecillas del reloj, la 1, la 3, sino mal recuerdo la 7, tenía entonces un enrojecimiento circunferencial de los labios menores de la vagina del himen con predomino de los bordes sin ruptura ni laceración del himen. Esas contusiones cuando nosotros la estamos viendo ¿qué pasa? [E]stán por detrás de la vulva y de los labios mayores y menores, ¿qué pasa? **Llegar hasta allá en esas contusiones y verlas en un caminito de 2 a 4 milímetros es producto de una agresión sexual**".[74] (Énfasis suplido).

---

[69] *Íd.*, pág. 215, línea 6.
[70] *Íd.*, pág. 285; líneas 19-22.
[71] *Íd.*, pág. 285; líneas 22-24.
[72] *Íd.*, pág. 292, líneas 4-5.
[73] *Íd.*, pág. 293; líneas 6-10.
[74] *Íd.*, pág. 293; líneas 20-28.

La patóloga identificó que las lesiones que la menor ATOQ reflejó en sus genitales eran producto de una agresión sexual.[75] Igualmente, señaló que la menor ATOQ tenía signos de haber padecido de una enfermedad de transmisión sexual.[76] Expresó que, a pesar de que habían lesiones que reflejaban que hubo otro evento previo, la causa de muerte fue el evento agudo que consistió en "la hemorragia subdural, edema cerebral, la hemorragia epidural en la región cervical y torácica y el trauma en el hígado y las lesiones en patrón en la superficie corporal".[77]

La patóloga también identificó que en el cuerpo de la menor ATOQ encontró 12.5 nano gramos de fentanilo, una cantidad catalogada como intoxicación.[78] Explicó que dicho opioide podía tener el efecto de poner a la menor ATOQ "letárgica, atontada, restringirla, hipotensa, verdad y entonces para llevar a cabo el acto, probablemente".[79] Por último, la patóloga recalcó que las lesiones, contusiones y abrasiones que observó en el cuerpo de la menor ATOQ eran compatibles con un puño o un manoplazo, así como con haber sido abusada sexualmente por el área vaginal y anal.[80]

Basado en esos hechos, es que el señor Ortiz Soto alega que no se probó más allá de duda razonable los elementos subjetivos requeridos de actuar "a propósito" o "con conocimiento". No obstante, tras evaluar la transcripción de los procedimientos, así como la prueba presentada en el juicio, este Tribunal concluye que el juzgador de los hechos en el presente caso no incurrió en pasión, prejuicio, parcialidad o error manifiesto en su apreciación de la prueba. Tampoco podemos concluir que su determinación no concordó con la realidad fáctica o que esta haya sido inherentemente

---

[75] *Íd.*, pág. 294, líneas 16-21; pág. 296, línea 10-12; pág. 297, línea 4-7 y 19-21; pág. 298.
[76] *Íd.*, pág. 296, líneas 23-30; pág. 297, línea 25-30.
[77] *Íd.*, págs. 298, líneas 26-30, y pág.299, líneas 1-7.
[78] *Íd.*, pág. 300, líneas 1-2.
[79] *Íd.*, pág. 300, líneas 24-26.
[80] *Íd.*, pág. 301, líneas 21-28.

imposible o increíble. Por el contrario, la evidencia demostró que el señor Ortiz Soto cometió el delito de asesinato en primer grado, bajo la modalidad de asesinato estatutario, "a propósito" o "con conocimiento".

Cónsono con el derecho antes esbozado, uno de los elementos que compone el delito de asesinato es la intención de causar la muerte. Esto implica los elementos subjetivos de actuar "a propósito" o "con conocimiento". Una persona actúa "a propósito" cuando su objetivo consciente es la producción del resultado. En cambio, actúa "con conocimiento" cuando está consciente de que la producción del resultado es una consecuencia prácticamente segura de su conducta. Particularmente, cuando se trata de la modalidad del asesinato estatutario, se requiere que la persona haya actuado "a propósito" o "con conocimiento", y que la comisión de alguno de los delitos bases especificados constituya un riesgo considerable que se realice el resultado, entiéndase causarle la muerte.

En el presente caso, de la prueba creída por el Jurado, surge claramente que el apelante estaba consciente del riesgo de su conducta. Nótense los siguientes hechos: el apelante golpeó fuertemente a la menor ATOQ en múltiples ocasiones para que esta hiciera silencio; lo cual le causó contusiones en la cabeza, brazos, toráx, abdomen; rodilla y pie derecho; al lograrlo, la penetró con sus genitales por la vagina y por el ano; luego la acostó, la arropó y se acostó a dormir. Además, como mencionamos anteriormente, en el cuerpo de la menor ATOQ se encontró 12.5 nano gramos de fentanilo. Asimismo, el apelante indicó que no era la primera vez que cometía estos actos y que lo hacía por el coraje que sentía por haber sido sodomizado en el pasado. De este modo, coincidimos con el juzgador de los hechos al interpretar que todos estos hechos demostraron, sin duda alguna, la intención criminal del apelante. Ello pues, golpeó y agredió sexualmente a su hija de dos (2) años de

edad, consciente de que le ocasionaría un daño, cuya consecuencia prácticamente segura era causarle la muerte. Por tanto, es nuestra apreciación que la prueba presentada demostró más allá de duda razonable todos los elementos de los delitos imputados.

Ante ello, y a la luz de la ausencia de pasión, prejuicio, parcialidad o error manifiesto en la apreciación de la prueba, esta Curia debe otorgarle total deferencia al veredicto unánime que rindió el Jurado en el presente caso. De este modo, determinamos que tampoco se cometió el sexto señalamiento de error.

### -IV-

Por los fundamentos esbozados anteriormente, **confirmamos** la *Sentencia* apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


                              Lcda.  Lilia M. Oquendo Solís
                         Secretaria del Tribunal de Apelaciones